**NATIONAL LABOR RELATIONS BOARD
v. SUPERIOR TANNING CO.**

No. 7424.

Circuit Court of Appeals, Seventh Circuit.

Dec. 14, 1940.

Rehearing Denied Jan. 15. 1941.

Lewis F. Jacobson, Sidney Merrick, and David Silbert, all of Chicago, Ill., for petitioner.

Robt. B. Watts, Laurence A. Knapp, and Mary Lemon Schleifer, all of Washington, D. C., for respondent.

Before EVANS and KERNER, Circuit Judges, and LINDLEY, District Judge.

KERNER, Circuit Judge.

This case is before us upon the petition of the National Labor Relations Board for a decree of enforcement of the Board's order which was issued against the respondent, Superior Tanning Company, under the authority of Section 10(c) of the National Labor Relations Act. 49 Stat. 449, 29 U.S.C.A. § 151 et seq.

Upon a charge duly filed by the National Leather Workers Association, Local 43 (hereinafter called the "Union"),[1] the Board issued its complaint against the respondent company alleging that it had engaged in unfair labor practices within the meaning of Sections 8(1) and 8(3) of the Act. In substance the complaint alleged that respondent violated Section 8(1) by advising, urging and threatening its employees against membership in the Union, by questioning them concerning their union activity, and by soliciting them to sign individual contracts of employment. The complaint further alleged that respondent violated Sections 8(1) and 8(3) by discharging and refusing to re-employ seven named employees because of their union membership and activity. Respondent filed an answer denying that it violated the Act in any manner.

The complaint above described was issued on February 7, 1938, respondent's answer was filed on February 13, 1938 and the hearing was held from February 14 to February 17, 1938. On April 15, 1938 the Trial Examiner filed an Intermediate Report in which he found (1) that in his talk to the employees at the afternoon meeting of May 20, 1937, Mr. Jacobson (respondent's attorney and draftsman of the printed contracts of employment) was "antagonistic towards unions" and (2) that "Jacobson's speech and the foisting of the contracts in question on the employees were clear violations of the Act." He also found that the five lay-offs (Dolnick, Stempinski, Semenaro, Terranova and Woodward) were due to a slump in business and that the two discharges (Adamczewski and Oppenheim) were made for proper cause. He recommended that the complaint be dismissed as to the allegations of violations of Section 8(3) of the Act and that appropriate relief be provided relative to the allegations of Section 8(1) violations.

On August 23, 1939 the Board rendered its Decision and Order, in which it found that respondent had violated Section 8(1) of the Act by warning its employees against joining the Union, by questioning them concerning their union activity and by inducing them to sign certain individual contracts of employment. The Board also found that respondent had violated Sections 8(1) and 8(3) of the Act by discharging Adamczewski because of his union membership and activity. It further found that the evidence did not sustain the allegations of discrimination as to the other six employees, and therefore dismissed the complaint as to them. Upon these findings of fact the Board based its order which contained the usual cease-

---

[1] Until March 1937 the labor organization which some of respondent's employees joined was known as Local 79, United Leather Workers International Union, affiliated with the American Federation of Labor. In March 1937 the organization sought affiliation with the Committee for Industrial Organization. Thereafter organization work was carried on in the name of the Tannery Workers Organizing Committee, a C. I. O. affiliate. In October 1937 the C. I. O. issued a charter to this group under the name National Leather Workers Association, Local 43. The membership of these locals and their officers remained constant throughout this period and the word "Union" is used in this opinion to refer to all these successive stages.

On June 4, 1937 a charge was filed by the Committee for Industrial Organization. On June 21, 1937 an amended charge was filed by Rudolph J. Burkey, organizer for the Union. The Tannery Workers Organizing Committee filed a second and third amended charge on October 22 and November 17, 1937 respectively. A fourth amended charge upon which the present proceeding is based, was filed by National Leather Workers Association, Local 43, on February 5, 1938. All of these charges except the first were signed by Burkey either individually or as organizer.

and-desist provisions and compelled certain affirmative action.[2] On August 15, 1940 the Board filed a petition for enforcement of its order.

■ *Applicability of the Act.* Respondent is an Illinois corporation engaged in the preparation and sale of leather. In 1937 its gross sales exceeded $2,000,000, approximately 80 percent of which represented sales to purchasers located outside the State of Illinois. Respondent purchases 13 percent of the hides which it processes from dealers located outside the State of Illinois, and the remainder is purchased from a dealer in Chicago. It also appears that dealers from whom respondent purchases its hides, obtain them from stockyards, meat packers and butchers throughout the United States. We think that the Act is clearly applicable to the respondent and its employees. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014.

*Union Activity.* In 1907 Henry, Samuel and Meyer Katz founded the tannery in question, and since 1907 its productive capacity has increased from 100 to 1000 hides per day. In 1937 Meyer Katz was president of the firm; William Katz, son of Henry, was vice-president; and Solomon Katz, son of Samuel, was secretary-treasurer. In May of 1937 respondent was giving employment to 271 persons including supervisory and office employees, and in February of 1938 it was employing only 212 employees. The Union (see footnote 1) came into existence in July of 1935 but it does not appear that its activity among respondent's employees was great prior to 1937. For instance there is evidence that John Tollick (employee of respondent) had joined and had become president of the Union by January 1, 1936 but there is no evidence of other employees joining the Union prior to 1937. It does appear however that some of the employees started to join in January of 1937; that after April 12, 1937, following the Supreme Court decisions thereon sustaining the validity of the National Labor Relations Act, the Union intensified its drive to organize respondent's employees; and that by May 20, 1937 approximately 100 employees had joined the Union, most of these having joined between April 12 and May 20, 1937.

Most of the testimony relating to union activity was given by Rudolph Burkey, the Union organizer. The Board believed this testimony and it was supported by the testimony of other Board witnesses. Counsel for respondent intimates that this testimony is not deserving of credence but his efforts in this respect are not convincing. For example, counsel mentions (1) that "long prior to May 20, 1937, over 100 employees of Respondent refused to join the Union"; (2) that Burkey said that "before the May 20th meeting *the Union had not even* started"; and (3) that Burkey admitted the Union *"stopped its drive* voluntarily after May 20."* Counsel's record references either fail to bear him out or show that his emphasis to the words above is misleading. In (1) Woodward, a negro employee who had joined the Union in March of 1937, testified that he had unsuccessfully solicited about 100 other negro employees to join the Union. In (2) Burkey stated that re-

2 Part 1 of the Board's order required respondent to cease and desist from the following: (a) Discouraging membership in the Union or any other union by anti-union discrimination against employees in regard to terms of conditions of their employment; (b) interrogating its employees as to their union affiliations or activities for the purpose of interfering with their right to self-organization; (c) giving effect to the individual contracts of employment; and (d) in any other manner interfering with their right to form, join or assist any union.

Part 2 of the order compelled respondent to take the following affirmative action: (a) Reinstate Adamczewski; (b) give him back-pay but deduct from this amount monies received for Government work-relief and reimburse the governmental agency which supplied such work-relief funds; (c) place the five lay-offs on a preferential list for future employment; (d) give separate notice to employees who signed the contracts in question or any renewal thereof, that such contracts were entered into pursuant to an unfair labor practice and that these contracts are invalid and will therefore be discontinued as a term or condition of employment; (e) post notices of compliance by respondent as to parts 1 and 2 of the order above described.

The Board also ordered the dismissal of the allegations of the complaint as to Oppenheim and the 5 employees laid off.

spondent had "hired Lewis F. Jacobson, a notorious anti-union lawyer, to smash the organization before it had a chance to start." In (3) Burkey stated that after May 20 the Union distributed a leaflet among the employees and called its employee-members to attend meetings without much success. On cross-examination Burkey admitted that the distribution of a leaflet would not constitute a "drive."

The Board also found that respondent was aware of the union activity already described. In this regard William Katz admitted that he saw John Tollick (employee and Union president) pass out Union handbills urging respondent's employees to attend union meetings. Solomon Katz admitted that Woodward (the negro employee) had told him he had joined the Union in March. Adamczewski (employee) testified that Meyer Katz came to him on the day after he had joined the Union, informed him he knew that Adamczewski had attended the Union meeting the previous night, and then asked him what had occurred there. Oppenheim (employee) testified that in March after he had joined the Union, William Katz came to him and informed him that he knew Oppenheim had joined the Union, and Semenaro (employee) testified that he told William Katz of his Union affiliation as soon as he had joined (March or April).

On this point counsel for respondent charges that the Board "repeats its *suspicion*" in its Decision and in its brief that Respondent was aware of the union activity among the employees. Among other things counsel states the "uncontradicted facts" to be that (1) "Woodward *voluntarily* informed Solomon Katz of his joining the union in *March, 1937* and was told by him that it was perfectly all right" and (2) that Meyer Katz' conversation with Adamczewski "deliberately omits Adamczewski's further testimony *that he was told at that time he could go to any union meeting and was not in any way censored.*" We note that (1) and (2) disclose support for the finding in question. Nor does the employer's attitude expressed in (1) and (2) militate against the particular finding. We conclude that there is substantial evidence to support the findings of strong Union activity between April 12, 1937 and May 20, 1937 and of knowledge by the respondent of this unionization.

*The Meetings of May 20, 1937.* At 9:30 in the morning on May 20, 1937 respondent selected about 30 employees and summoned them to a meeting in respondent's conference room. There respondent's officers introduced them to Mr. Jacobson, respondent's counsel, and informed them that on that day, the thirtieth anniversary of the founding of the tannery, the respondent wanted to ascertain if the employees were satisfied with employment conditions and to make an offering of a bonus or vacation or guarantee. Then Mr. Jacobson asked the employees whether they had any grievances or suggestions; several suggestions concerning wages and working conditions were advanced by the employees; and these were promptly accepted by the respondent. Whereupon Mr. Jacobson said that "he thought he could perhaps draw up a contract between the men and guarantee all these things." The meeting was over by 10 or 10:30 o'clock a. m., and Mr. Jacobson telephoned a printer and arranged to have the contracts printed and returned to respondent by noon of the same day. Most of the story above related was told by William and Solomon Katz. They also testified that the meetings of May 20 were called because they desired on their thirtieth anniversary to "continue and cement" the friendly feeling that had always existed between respondent and employees and because they feared that the general industrial unrest then prevalent throughout the country might affect the respondent's operations.

On this point counsel for respondent observes that "Purely as an *afterthought* the Board seeks to indict Respondent * * * for conferring with some of its employees to discover if any dissatisfaction or grievances existed." In this connection he refers us to a marginal note which reads that "The Trial Examiner reported: 'Men had been *picked at random,* several from each department in order to make up a *representative* group,'" and then he concludes that respondent has never contended nor does the evidence show that the morning meeting was considered by respondent "as collective bargaining by or with persons who even claimed to be acting as representatives." Perhaps counsel is sound in the conclusion thus expressed, but even so we fail to see that great consequence attaches thereto. Certainly the emphasis given by counsel to the words used by the Trial Examiner is not fair, for it appears that the Trial Examiner in this instance was merely ap-

proving the exact language of Solomon Katz when he testified that "These men were picked at random. * * * And we had a representative group meet with Mr. Jacobson and ourselves."

Counsel for respondent also observes that "Respondent had particular cause for concern [as to sit-down strikes then prevalent]. *In its business, hundreds of thousands of dollars of perishable hides * * * are always in alternate lime and various successive chemical soak and unless each daily soak of hides is taken out of these successive vats at particular specified periods they will decay and become a total loss.*" Counsel's record references relate to a description by Solomon Katz of the processing of hides into leather. First the sinews, pate, tail and hoofs are removed (the trimming operation). Next the flesh adhering to the hide is removed (the fleshing operation). Then the hide is given a lime bath "for about a week" and an acid or pickle bath "for several hours." After this comes the tanning operation. Solomon Katz stated that "Up to this point the fiber in the hide will decay; it is subject to atmospheric conditions." We note that this description was given early in his testimony and was quite unrelated to the expression of fear of what a sit-down strike would do to respondent. Nor do we understand from the processing description that a failure to remove each soak of hides from the lime and acid baths at the "particular specified periods," would produce decay and totally destroy the hide. In fact the inference we draw from Solomon Katz' testimony here is that the danger of decay lurks more in the preceding operations and in transferring between operations than in the lime and acid stages emphasized by counsel.

At 12:30, immediately following the lunch period and during working hours, respondent summoned all its employees to a meeting in the plant. Respondent's officials and supervisory employees were present, and Mr. Jacobson addressed the men for about an hour. He commenced with the history of the company, pointed out that May 20, 1937 was its thirtieth anniversary and indicated that respondent desired to continue the harmonious relation that had always existed between company and employees. He discussed unions but there is some conflict in the testimony as to what he said on this topic. He added that the company and a group of 30 men who attended the morning conference "had agreed to an individual contract" and then read the printed contract, after which Czonstke (foreman) translated the contract into Polish for the benefit of the Polish employees who did not understand English. The above story concerning the afternoon meeting of May 20, 1937 was told by Solomon Katz. Counsel for respondent cautions against failure to connect this testimony with what Solomon Katz said concerning the morning meeting. As to the morning meeting he said that "from these conversations with the men and Mr. Jacobson and ourselves the idea of an individual contract was born. We drew up a tentative contract. * * * They said it would be [satisfactory] and volunteered that if these contracts were prepared that they would pass them out to the rest of the men in the plant."

When Mr. Jacobson had finished his speech, an employee named Villastriga (who had joined the Union and was secretary thereof) asked (1) "why no union speaker had been invited to the meeting" that day (2) "to refute the charge that he had made against the unions." Solomon Katz admitted that Villastriga had uttered statement (1), denied statement (2) had been made, and stated that in reply to (1) Mr. Jacobson stated that unions had their own meeting halls and "anyone was free to go to listen to a union speaker who wanted to." Villastriga testified that he made statements (1) and (2), and that after the adjournment of the meeting William Katz summoned him to his office. There he met Mr. Jacobson who remarked that Villastriga "shouldn't take it as a personal matter, the fact that he [Jacobson] was speaking against the union and that he [Villastriga] had spoken and belonged to a labor union."

Solomon Katz, William Katz, Frank Czonstke (foreman) and Stanley Jandow (foreman) testified that in his speech Mr. Jacobson said that the men were free to join any union they wished; that while some unions such as Lewis' and Green's were "good unions," others were run by racketeers like Al Capone and Mussolini; and that the men could sign the individual contracts and still belong to a union. Terranova, Dolnick, Semenaro, Oppenheim and Villastriga (employee witnesses) denied that Mr. Jacobson had said that the employees could sign the contracts and still join the union, or that Mr. Jacobson in his denunciation of "outside" labor or-

ganizations had made any distinctions between "good" and "bad" unions. As to the purport of the Jacobson speech, the Trial Examiner reported that he had been impressed particularly by the sincerity of Woodward. On this counsel for respondent pointed out that "Ironically the Decision of the Board fails to mention anything of Ulysses Woodward * * * in respect to the speech at the meeting." Woodward testified as follows: "He [Jacobson] didn't say that we would lose our jobs by joining the union. He said we was free to do anything we wanted to do but the union couldn't help us none. It was just the same as Frank [Czonstke] told us; it was a bunch of racketeers; that we will get out on the streets and wouldn't have no job or food with it. He didn't say we couldn't do it. We was free to do anything we wanted to do, but he said it was all racket. * * * He didn't say anything about if we signed the contracts we couldn't belong to the union. We was free to do anything we wanted to do."

The evidence relating to the meetings of May 20, 1937 discloses (1) a possible conflict between respondent's testimony and the Board's finding in regard to the purpose of the meetings and (2) a testimony conflict in regard to whether the Jacobson speech included (a) a denunciation of labor union generally and (b) a statement that the employees could sign the contracts and still belong to any union they wished. As to (1) the respondent testimony stated the purpose of the meetings was (a) to grant certain requests of the employees in commemoration of its thirtieth anniversary and (b) to allay their own fear of sit-down strikes then prevalent in America. The Board's finding stated the purpose of the meetings was to interfere with the unionization of its employees. As to (2) the respondent's testimony denied the Jacobson speech included (2) (a) and insisted it included (2) (b), and in the main the employee testimony insisted it included (2) (a) and denied it included (2) (b). The observations on (1) and (2) which we shall make shortly, are formed with the evidence summarized in the margin[3] in mind.

We observe that respondent's testimony on points (1) (a) and (2) (b) is not necessarily inconsistent with the Board's finding of Union interference. Counsel for respondent has called our attention to a marginal note in his brief entitled "Some Daily Headlines and Features" which refers to sit-down strikes occurring between February 17 and May 20, 1937. This marginal note associates sit-down strikes with unions, especially the C. I. O. We are also reminded by counsel for the Board that any discussion of unions in the Jacobson speech was unnecessary and irrelevant if the purpose of the meetings was as indicated in (1) (a), and we cannot overlook the fact that this particular commemorative action on the part of respondent was the first of its kind in the entire history of the tannery. We observe on point (2) that even without any evidence relating thereto, the meetings and the reading of the contracts would have pressed on the minds of the employees the thought that respondent preferred to deal with them on an individual basis. However, on this point we note that the Trial Examiner was "particularly impressed" by the testimony of Woodward. According to Woodward both statements

---

[3] The undisputed evidence relating to the meetings of May 20, 1937 is as follows: (1) On this day respondent called its employees to two meetings which occurred in the plant and during working hours; (2) this was the first time in respondent's history that any such meetings had taken place, although 12 years before a mass meeting had been called for some occasion the nature of which was not recollected; (3) to the morning meeting came about 30 employees whom respondent had selected and who apparently had no advance notice either of the meeting or of its purpose; (4) there they met the company officials and the company attorney who invited them to make suggestions as to working conditions; (5) this meeting lasted less than one hour; (6) a draft of a contract was there drawn up by Mr. Jacobson and immediately sent by him to a printer, and the printed contracts were returned in time for the afternoon meeting; (7) to the afternoon meeting came all the employees and the supervisory employees and company officials were there; (8) Mr. Jacobson addressed the employees, discussed unions, explained the printed contract to the employees, and then told them they would be given a contract to sign; and (9) foreman Czonstke translated the contract into Polish for the benefit of Polish employees.

Pertinent evidence in this connection is evidence of the Union campaign and of knowledge by the respondent of this unionization.

(2) (a) and (2) (b) were included in the Jacobson speech. Yet a fair reading of Woodward's testimony in its entirety and in relation to the evidence summarized in footnote 3, leaves the reader with the inescapable inference that the Jacobson speech was antagonistic to unionism and absolutely unnecessary if the purpose of the meetings was the profession of desire expressed in (1) (a). Moreover, on this record it is difficult to believe that "the idea of an individual contract was born" during the morning meeting and that an open and fruitful discussion of "our mutual problems" transpired at this conference. We are convinced that the Board was justified in drawing the inference of fact that the purpose of the meetings was to interfere with the Union campaign and that respondent's conduct on that particular day evidenced to the employees the employer's aversion to unionization.

*Execution of the Contracts.* At the conclusion of the meeting copies of the individual contract were distributed by respondent's officers and supervisory employees. Within a short period of time 269 of the 271 employees in the plant had signed these contracts, although it appears that some of the employees (e. g., Oppenheim, Stempinski, Semenaro and Woodward) did not know or could not understand what the contracts provided for. In this connection foreman Czonstke testified that he "marked" some of the contracts for employees who were unable to read or write English. According to Adamczewski, William Katz gave him six contracts, told him to "hurry up sign this contract" and urged him to distribute the others to his "partners." He added that he did not sign his contract immediately and that Meyer and William Katz promised him a month's vacation if he signed. Dolnick testified that the contracts were on a table and that the foreman told the workers to take these contracts and to "God damn it, sign it up." He added that the "foreman did not give anyone a chance to discuss this contract. He just drove them into signing the contracts." On cross-examination Dolnick stated that the foreman was Stanley Jandow, that the words in question were uttered immediately after the meeting in the finishing department, and that he did not sign until the next day when Jandow advised him that "Steve, you no sign yesterday contract. Go ahead now, you know, in the office, sign up." Dolnick then went downstairs to the office where William Katz said "Steve, sign that contract, everybody sign." Stempinski corroborated Dolnick's story relating to the execution of the contracts and there is testimony by Semenaro and Terranova that their supervisors instructed them to "hurry up" and sign or "to sign."

It is evident that the testimony in the preceding paragraph, if believed by the Board, constituted substantial evidence that the respondent's supervisors and officials exerted considerable pressure to obtain employee signatures to the contracts. It is true that foremen Jandow and Czonstke denied the story told above by the employee witnesses. But it is the province of the Board and not of this Court, to appraise conflicting testimony and determine questions of credibility. Counsel for respondent seeks to discredit the employee witnesses but in this he fails. It is conceded that the employee witnesses were interested in the outcome of the Board hearing and they had difficulty in expressing their thoughts in English, but these considerations do not necessarily affect credibility adversely. Although there are differences in the testimony given by these employees, especially on the purport of Jacobson's speech, in the main they tend to substantiate each other. We cannot conclude on this record, as counsel for respondent urges, that the Board erred in believing the employee witnesses rather than respondent's witnesses.

*The Printed Contracts.* The individual contracts signed by the employees contained the following provision for the "adjustment" of disputes: "Adjustments.— the Company will endeavor to adjust with the Employee all complaints and disputes by negotiation, if possible. If it cannot be so adjusted, the Employee hereby selects ....................... as his representative and arbitrator, and the Company will select its representative, and they shall promptly hear and adjust all such complaints, or failing to do so shall select a third arbitrator, which three shall promptly hear, adjust and arbitrate. * * * The decision of a majority of such Board to be final. * * *" It would be reasonable to expect that since the Union had a substantial membership among the employees, some workmen would have named the Union as their "representative and arbitrator." Yet the employees who signed the contracts, unanimously designated employees of respondent as their

"representative and arbitrator." Three explanations may be assigned for the unanimous designation of the employees, namely, (1) they did not want the Union to be their "representative and arbitrator"; (2) they understood the "adjustments" provision to exclude the designation of the Union; or (3) they understood respondent's conduct on May 20, 1937 as a warning that respondent would not tolerate the naming of an "outside" representative. On the record before us the Board would have been justified in accepting (2) or (3) as the true explanation. Explanation (3) is more consistent than (2) with the evidence that after May 20, 1937 the Union obtained less than 6 new members and very few of those who had joined attended Union meetings.

In December of 1937 the contracts were renewed in modified form for another year and all but one of the 212 persons then employed signed, each naming an employee "representative and arbitrator." Respondent called a meeting of the representatives under the 1937 contracts, the meeting was held at respondent's plant during working hours and it lasted about an hour. At this meeting Solomon Katz proposed certain changes in the 1938 contracts and these changes were accepted by the representatives. These changes were sent to Mr. Jacobson and by him incorporated in the 1938 contracts. After the 1938 contracts were printed, Solomon Katz called the representatives to his office, gave them the contracts to distribute among the men and instructed them to "be very careful that the men * * * do not omit to * * * [designate] their representative for 1938." It appears that the 1938 contracts were less favorable to the employees than the 1937 contracts, but a detailed comparison of the 1938 and 1937 contracts is not necessary to this opinion.

*Adamczewski.* The complaint alleged that 7 named employees had been discharged or laid off because of their Union affiliation and activities. The Trial Examiner found that these employees had been discharged or laid off for non-union reasons. In the case of Adamczewski the Trial Examiner said: "The motive for his discharge is not entirely free from doubt; nevertheless, the fact that seven of the ten stakers belonged to the Union, one of them being Albert Villastriga, an officer of the Union * * * [none of whom were discharged], would seem to in-

dicate that there was no particular reason why the respondent should discriminate against Adamczewski." Respondent's testimony indicated that Adamczewski was discharged for improper workmanship. The Board dismissed the allegations of the complaint as to the discharges of all the employees except Adamczewski and found that the latter was discharged because of his membership and activity in the C. I. O.

There is evidence (1) that Adamczewski had worked as a staker since 1924; (2) that Meyer Katz admitted that Adamczewski was the best staker in the plant, on the day after his discharge; (3) that Adamczewski was active for the Union; (4) that the company regarded him as a Union leader among the Polish employees; and (5) that he was the only staker who did special work and that he had been entrusted with the instruction of new men during January of 1937. Adamczewski testified as to (2), (3) and (4) above and Villastriga testified as to (5). Respondent's testimony disclosed that Adamczewski was discharged for his poor work, that he had been requested and warned about ten times in 1937 to give skins the required ten or twelve strokes and that he had continued to give only two or three strokes per skin. Adamczewski denied that there had ever been complaints concerning his workmanship or that he had ever failed to give skins the proper number of strokes; to the contrary, he testified that he was repeatedly complimented on his work by respondent's officers and supervisory employees.

Counsel for respondent points to inconsistencies in Adamczewski's testimony and argues from this that he is guilty of an apparent "disregard for the truth." It is evident from the record that Adamczewski is almost completely unable to understand English and it is reasonable to believe that the inconsistencies in his testimony were due to his difficulty of understanding and expression. In his report the Trial Examiner did not question the credibility of this witness nor did he censure his testimony in any way. The Trial Examiner observed in the case of Adamczewski that "The motive for his discharge is not entirely free from doubt." We note that this "doubt" was not expressed in the case of Oppenheim, nor did the Board in that instance conclude differently than the Examiner. In one case this

court has stated that "while the report of the Examiner is not binding on the Board, yet where it reaches a conclusion opposite to that of the Examiner, we think the report of the latter has a bearing on the question of substantial support and materially detracts therefrom." A. E. Staley Manufacturing Company v. National Labor Relations Board, 7 Cir., 117 F.2d 868, filed November 14, 1940. We think that had the Board reached a conclusion opposite to that reported by the Examiner in the case of Oppenheim, the Examiner's report would have materially detracted from the Board's finding. But in Adamczewski's case the Examiner expressed doubt as to the true motive for the discharge and he did not discredit Adamczewski's testimony. There is evidence in the record which supports the finding of a union-biased discharge and we accept the finding, it mattering little how we would have acted on the same point had we been the Board. We cannot say that the Board erred in reversing its Trial Examiner.

 *The Employer's Rights.* Counsel for respondent states in his brief that the Board's action in this case violates (1) the right of free speech of an employer and (2) his privilege to make individual contracts of employment with his employees. This court has already spoken on (1) above: "No expression of an employer's opinion, as such, on any subject can constitute an unfair labor practice; and obviously the National Labor Relations Board has no authority to interfere with an employer's untrammeled expression of views on any subject. We assume, however, that statements either of an employer or of employees which are relevant to a pending controversy, may be utilized as evidence. Statements of employers have been treated as evidence of interference with the exercise of the employees' rights under the Act." National Labor Relations Board v. Lightner Pub. Corp., 7 Cir., 113 F.2d 621, 626; see also Jefferson Electric Co. v. National Labor Relations Board, 7 Cir., 102 F.2d 949, 956; National Labor Relations Board v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, 786, and National Labor Relations Board v. Elkland Leather Co., 3 Cir., 114 F.2d 221, 224. This court has said recently that "Expressions of opinion concerning labor unions, by an employer, * * * may be of such a nature that their effect is to coerce and intimidate the employees * * *.

To hold that such expression, when employer manifestly intended to give them such an effect, are not violative of the Labor Act, would be to nullify the provisions of the Act and to thwart the public policy evidenced by said Act." National Labor Relations Board v. Chicago Apparatus Co., 7 Cir., 116 F.2d 753, filed December 12, 1940.

 This court has not spoken expressly on (2) above but other Courts have. The Act does not preclude the employer from "electing" to make individual contracts with his employees. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. Nor does the Act compel an employee to form, join or assist a labor union, and he may deal individually with the employer. National Labor Relations Board v. Sterling Electric Motors, 9 Cir., 109 F.2d 194, 202. But the primary objective of the Act is to secure the employees against employer interference, restraint or coercion in relation to unionization and collective bargaining. 49 Stat. 449, 452; Secs. 7 and 8(1), 29 U.S.C.A. §§. 157, 158(1); National Labor Relations Board v. Jones & Laughlin Steel Corp., supra, 301 U.S. pages 33, 34, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. And we realize that the right to be free from employer interference "would be of no value if they [the employees] were not also given the right to act freely; that is, make their own choice—uninfluenced from without." Foote Bros. Gear & Machine Corp. v. National Labor Relations Board, 7 Cir., 114 F.2d 611, 622. In the instant case the respondent engaged in a planned program to discourage unionization of his employees and to eliminate the Union from its plant. We have already tested the evidence which is substantial, and it is clear that the individual contracts were a part of the plan to keep the employees from joining the Union.

 *Scope of Order.* This court has had occasion many times to discuss the propriety and scope of Board orders. The order of the Board is enforceable if it directs itself to the appropriate effectuation of the policies of the Act. In this regard consideration is to be given to the complaint, the findings of fact and the character of the unlawful employer conduct. National Labor Relations Board v. Swift & Co., 7 Cir., 108 F.2d 988, 990. We observe at once that the cease-and-

desist paragraphs 1(a), 1(b) and 1(d) and the reinstatement paragraph 2(a) are proper, and the Board is entitled to an order of enforcement thereto from this court. The back-pay paragraph 2(b) contains the usual back-pay clause and an additional provision requiring respondent to reimburse the governmental agencies which supplied funds to Adamczewski for work-relief after his discharge. The additional provision is beyond the Board's authority and the back-pay order will be enforced with that provision eliminated. Republic Steel Corp. v. National Labor Relations Board et al., 61 S.Ct. 77, 85 L.Ed. ——, decided November 12, 1940 by the United States Supreme Court.

■ The complaint alleged that five named employees were laid off for anti-union reasons. The Board found that the evidence adduced did not sustain the allegations of the complaint, and consequently ordered the dismissal of the allegations of the complaint. In view of respondent's conduct in this case the Board felt it "possible that the respondent will not re-employ these five men, even if their former positions or substantially equivalent positions become available." Accordingly the Board ordered the five men placed on a preferential list to be offered employment as it arises. Counsel for the Board argues that "It has been the Board's experience that such precautionary orders in circumstances like the present tend to effectuate the policies of the Act. This settled and uniform administrative practice is entitled to weight." We are convinced the action of the Board in this respect was neither necessary nor proper. We perceive no difference, once the above allegations of the complaint are dismissed, between these five named employees and the many more who the record shows were also laid off during the same period. We appreciate the reasons assigned by the Board for the requirement in question but we think that the Board has gone beyond its statutory authority. Under the circumstances the exercise of such a power takes on a punitive character not contemplated by the Act. The statute authorizes the Board to order such action as will effectuate the Act. This however does not license the Board to go further than the record, the issues in the controversy and the policies of the Act warrant. It is certain that prior administrative practice does not justify an enlargement of statutory powers. We conclude that paragraph 2(c) is too broad and hence is not entitled to our order of enforcement.

■ In paragraph 1(c) the Board ordered respondent to cease giving effect to the individual contracts of 1937 and 1938. As we have already shown, the record supported the finding of fact that the contracts were an instrument of employer interference and restraint and therefore were made in violation of the Act. It follows, we believe, that the order to cease giving effect to the contracts is a necessary consequence of the finding of fact above described. In National Labor Relations Board v. J. Greenebaum Tanning Co., 7 Cir., 110 F.2d 984, 987, this court sustained an order requiring the employer to cease giving effect to a closed-shop contract made in violation of the Act. We think the Greenebaum case is authority for the instant case and we also think the following cases support our position. National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 359, 360, 60 S.Ct. 569, 84 L.Ed. 799; International Association of Machinists v. National Labor Relations Board, 71 App. D.C. 175, 110 F.2d 29; National Labor Relations Board v. National Motor Bearing Co., 9 Cir., 105 F.2d 652.

■ In this connection counsel for respondent argues that the Board has no jurisdiction whatever over contracts whose terms do not violate the Act. Apparently he distinguishes between (1) contracts whose terms per se violate the Act and (2) contracts whose terms are fair on their face but which in their history, execution and existence are tainted by employer conduct condemned by the Act. Perhaps it is true that depending on the character of the unlawful employer conduct, the Board may have a larger discretionary power as to remedy in cases relating to (1) than in cases relating to (2). But it is evident no distinction between them can be made on the question of jurisdiction. It is impossible to indorse the argument that the legality of contracts in labor cases is determined solely from the terms of the contracts themselves.

Counsel for respondent contends that the National Licorice Co. case is only authority for cases relating to (1). No doubt counsel is correct to the extent that certain language in the opinion is really not necessary to the decision of the case. However, the language in question is per-

suasive and we think it is the law that contracts in class (2) may be appropriate subjects for the. affirmative remedial action;of the Board. Compare Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 236, 59 S.Ct. 206, 83 L.Ed. 126; National Licorice Co. case, supra, 309 U.S. page 361, 60 S.Ct. 569, 84 L.Ed. 799. We are not prepared to state that in our case the Board has exceeded its discretionary power in ordering the employer to cease "giving effect" to these contracts. Moreover it is our conclusion that the *Adjustments* or arbitration clause found in all these contracts, in itself, violates the Act in that it has the obvious effect of restraining the employees in the exercise of their rights under Section 7 of the Act. It is unnecessary to say more in this connection inasmuch as our conclusion does not add materially to the result already reached.

Counsel for respondent also contends that paragraph 1(c) is too broad in ordering respondent to cease giving effect to the contracts (1937 and 1938) "or to any·modification, continuation, extension, or renewal thereof or to any similar form of contract for any period subsequent to December 31, 1938." A similar contention was made and rejected in National Labor Relations Board v. Swift & Co., 7 Cir., 108 F.2d 988, 990 and we reach the same conclusion in this case. We hold that paragraph 1(c) of the order is proper, as is paragraph 2(d) which among other things requires notice to each employee that the contract violates the Act, and the Board is entitled to an order of enforcement .as to paragraphs 1(c) and 2(d) on condition that paragraph 2(d) of the Board's order be modified as follows: delete from paragraph 2(d) of the order the words "that it is invalid and void" and add at the end of the said paragraph the words "but this is without prejudice to the assertion by the employees of any legal rights they may have acquired under such contracts." See National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 364, 367, 60 S.Ct. 569, 84 L.Ed. 799.

We have also considered the point raised by counsel for respondent that the Board is barred by delay and laches from enforcing its order and we find the point without merit. Our conclusion is that except as provided otherwise in this opinion, the order of the Board is supported by the evidence and is entitled to an order of enforcement from this court. It is so ordered.