**WYMAN–GORDON CO. (INGALLS SHEPARD DIVISION) v. NATIONAL LABOR RELATIONS BOARD.**

No. 8872.

Circuit Court of Appeals, Seventh Circuit.

Feb. 9, 1946.

Petition for Modification Denied March 18, 1946.

George B. Christensen, Frank B. Gilmer, and Edward J. Wendrow, all of Chicago, Ill., (Winston, Strawn & Shaw, of Chicago, Ill., of counsel), for petitioner.

Malcolm F. Halliday and A. Norman Somers, N.L.R.B., both of Washington, D. C., and Herman Dekoven, N.L.R.B., of Chicago, Ill., and David A. Morse, Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Marcel Mallet-Prevost, Margaret M. Farmer, Attys., N.L.R.B., all of Washington, D. C., for respondent.

Before MAJOR and KERNER, Circuit Judges, and BALTZELL, District Judge.

MAJOR, Circuit Judge.

This case is here upon petition of Wyman-Gordon Company (Ingalls Shepard Division) (hereinafter referred to as petitioner), to review and set aside, and upon the National Labor Relations Board's answer and request for enforcement of an order of the Board issued against petitioner on June 20, 1945, pursuant to Section 10(c) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. The order is based upon findings that petitioner, in violation of Section 8(2) of the Act, dominated and supported the Employees' Council (hereinafter referred to as the Council); discriminatorily discharged and refused to reinstate three employees, namely, F. M. Baker, William (Bud) Coale and Peter Crince, in violation of Section 8(3) of the Act; and by these and other actions interfered with, restrained and coerced its employees in the exercise of their statutory rights, in violation of Section 8(1) of the Act. The order requires petitioner to cease and desist from the unfair labor practices found, to withdraw recognition from and completely disestablish the Employees' Council as the representative of its employees, to offer reinstatement with back pay to the employees found to have been discriminated against, and to post appropriate notices.

While petitioner presents numerous questions designated as contested issues, we think they are in the main embraced in the major issue as to whether the Board's order is supported by substantial evidence.

The Board's consolidated complaint, issued May 13, 1944, was predicated upon charges filed by two organized unions, the United Steelworkers of America (hereinafter referred to as the Steelworkers) and the International Die Sinkers' Conference (hereinafter referred to as the Die Sinkers). The former charge was filed with the Board June 23, 1943, and the latter, August 14, 1943. Petitioner's answer denied any and all unfair labor practices and affirmatively alleged that the discharges of Baker, Coale and Crince were for interference with production by solicitation of union membership during working hours, by telling men to slow down their production, and for otherwise interfering with vital war production. The answer further alleged that petitioner was engaged in the production of intricate crankshaft forgings for military aircraft and was under a duty to maintain full production and to obtain full use of its facilities out of available manpower and to discipline or discharge employees interfering with that duty.

A lengthy hearing was had before a Trial Examiner, participated in by all the interested parties except the Council. The Examiner in his intermediate report found that the Council was a labor organization within the meaning of the Act and that petitioner had dominated and interfered with its formation and administration and had contributed financial and other support to it, in violation of Section 8(2) of the Act. All other issues were found against the Board and in favor of petitioner, with a recommendation that the charges giving rise to such issues be dismissed. The Board unanimously accepted the report of the Examiner that petitioner was guilty of an unfair labor practice in its domination, interference and support of the Council. A majority of the Board, however, refused to accept the recommendation of the Examiner, which had exonerated petitioner of all other unfair labor practices and found to the contrary. One member of the Board dissented from the findings of the majority, in other words, expressed the conviction that the recommendations of the Examiner should be accepted in their entirety.

### Employees' Council.

We have reached the conclusion that the Board's finding with reference to the Council must be sustained, and we are of the view that no good purpose could be served in a lengthy discussion of the facts relative thereto. Before briefly discussing such facts, however, we think it is pertinent to observe, especially in view of the Board's contention in connection with the alleged discriminatory discharges, that petitioner's relation to the Council furnishes no proof of hostility toward outside unions. There is no proof that any outside union entered petitioner's plant or undertook to organize its employees until about a year before the issuance of the Board's complaint. The record discloses without any contradiction that petitioner at all times prior to the events involved in this hearing maintained a friendly, cooperative attitude toward its employees and that it paid the highest wages of any company engaged in a similar industry. We have heard much from the Board in other cases of the importance to be attached to an employer's background

when it disclosed a hostile and unfavorable attitude toward unions. If an employer's conduct in one case is to be evaluated in the light of a background hostile to its employees and especially to unions, we see no reason why an employer's attitude in another case, such as the instant one, should not also be considered in the light of a favorable background.

Briefly, the Council was organized in 1934, prior to the effective date of the Act, and has functioned in substantially the same manner during the intervening period. As stated by the Examiner, it was initiated· by "an employee in the welding department, who assembled a group of other employees from the various departments and proposed to them the organization of a representative body which could deal with management on matters of wages, hours, working condition, safety, health, plant sanitation and other matters of mutual interest to the employees. At the request of this group, Harold F. Wood, respondent's (petitioner's) general manager, assisted them in completing the organization by reducing the proposed constitution and by-laws which had been roughed out by the organizers, to appropriate language."

The employees of the various departments elected annually by secret ballot a councilman as the representative of the employees in that department, and one of the eligibility requirements was that a councilman must have been in petitioner's employ for at least one year prior to election. The Council collected no dues from its members, and all of its expenses, such as the cost of printing and distributing copies of its constitution and by-laws, ballots for the conduct of its annual elections, and other incidental expenses, were borne by petitioner. The Council was permitted the use of a basement room in petitioner's office building for its meetings. Such meetings were held at 3:30 p. m. on the third Friday of each month. The first hour of such meetings was devoted to a discussion between the councilmen as to the matters which they desired to take up with management. At 4:30 p. m., representatives of management entered the meeting and discussed with the councilmen such matters as the latter desired to present. Petitioner reimbursed the councilmen at their regular rate of pay for the time spent at such meetings. Such pay included both the time when the councilmen were in conference among themselves and the time spent in the conference with management. Also, it included time spent by councilmen in attending such meetings outside of their regular working hours.

Petitioner contends that there is no evidence in support of the Board's finding that it either dominated or interfered with the administration of the Council. We think there is merit in this contention. Certainly there is no direct proof of such domination or interference. In fact, there is voluminous testimony by witnesses for both sides that the employees, including the councilmen, were entirely free of all subservience to petitioner. We also note that we do not agree with much of the Board's argument as well as some of its findings designed to show domination and interference. It seems to us, however, that it would be rather useless to dissect the controversy concerning domination and interference in view of the fact that there is evidence in support of the Board's finding that petitioner contributed financial and other support to the Council. It may be, as petitioner contends, that such support was so infinitesimal as to be of little significance. We are of the view, however, under numerous authorities which need not be cited or discussed, that the support furnished was sufficient to justify the Board's finding in that respect. It follows that the Board was authorized to characterize such support as an unfair labor practice and to order the disestablishment of the Council.

At this point we note that the Board during the hearing denied petitioner's petition to reopen the record and receive further evidence concerning the financial support accorded the council and especially the amount which was paid to councilmen during the period their meetings were on company time as distinguished from that period when the meetings were on their own time. Such petition has been renewed in this court. We have examined the proffered testimony, and even if it was accepted we are of the view that it would not change the result. Petitioner's request in this respect is denied.

Also at this point we note that petitioner has filed in this court a petition in which it is alleged that the Council since the Board's order has voluntarily disbanded and that the Independent Union of Ingalls Shepard Division of Wyman-Gordon Company has been certified by the Board as the exclusive bargaining representative of all

production and maintenance employees of petitioner except those in supervisory, office and clerical positions. Petitioner alleges that by reason of this situation the Board's order requiring disestablishment of the Council has become moot and prays that the order be set aside for such reason. The Board by answer to such petition does not dispute that the situation has changed as alleged but contends that such change does not affect the validity of its order. A number of cases are cited in support of such contention, including National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 576, 82 L.Ed. 831, 115 A.L.R. 307, wherein the court stated: "* * * an order of the character made by the Board, lawful when made, does not become moot because it is obeyed or because changing circumstances indicate that the need for it may be less than when made."

■ We think the Board's contention in this respect must be sustained, notwithstanding that it is difficult to discern under the circumstances of the instant case any good purpose which can be served by the order.

### The Discharges.

Baker was discharged June 19, 1943, and Coale and Crince August 9, 1943. The Board found and concluded that such discharges were discriminatory, in violation of Section 8(3) of the Act. The sole question before this court is whether the Board's findings and conclusions as to these discharges are substantially supported. As already pointed out, the Board, one member dissenting, decided this issue contrary to the recommendation of its Trial Examiner. As pointed out by the dissenting member of the Board: "The central question in each of these cases is whether or not the employee was discharged for misconduct or for union activity. It is clear from the record that each of the complainants involved were guilty of acts which tended to retard production of important war materials. It is also clear that the complainants were conspicuous union adherents. Under such circumstances, the ascertainment of motive is at best elusive. This is particularly true of the instant cases where the Trial Examiner's final conclusion that the discharges were proper was based upon the resolution of conflicting testimony. In reaching his result, the Trial Examiner had the opportunity of seeing the witnesses and appraising their credibility. Yet the majority of the Board, without having this opportunity, are now choosing to discredit certain witnesses whom he believed and crediting the complainants, even though it is admitted that not all their statements or conduct can command respect. This seems to me dangerous procedure, particularly when we are dealing with findings which rest upon substantial direct testimony rather than upon inference."

■ We realize that the findings of the Board must be accepted if substantially supported, notwithstanding that one member dissented and approved the recommendations of the Trial Examiner which the majority of the Board refused to follow. We think, however, that such contrariety of views may be properly taken into consideration, in fact, that it has a material bearing upon the question as to whether the Board's findings are substantially supported. Staley Manufacturing Co. v. National Labor Relations Board, 7 Cir., 117 F.2d 868, 878; National Labor Relations Board v. Superior Tanning Co., 7 Cir., 117 F.2d 881; Wilson & Co. v. National Labor Relations Board, 8 Cir., 123 F.2d 411, 418; National Labor Relations Board v. Ohio Calcium Co., 6 Cir., 133 F.2d 721, 724.

At this point it also seems pertinent to note the character of the business in which petitioner was engaged at the time of the discharges in question, and in fact during the period of the war. The record discloses that it was the largest drop forge company in the world. During the war its employment rose from approximately 1,000 to in excess of 3,000, and it became the nation's largest forger of crankshafts, connecting rods and other parts for combat aircraft engines. For many months it was the only company equipped to produce the forgings upon which the renowned Allison and Pratt & Whitney engines depended. This situation was so perilous that it was divulged to only two men in the company. The necessity for unimpeded productivity was absolute. As stated by the Trial Examiner: "At that time (referring to the summer of 1943) the primary forgings being produced by Respondent (petitioner) were certain crank shafts and related parts for aircraft motors, which were available from no other source and were necessary to maintain the aircraft production program that had been geared to the European invasion plans."

The argument in the Board's brief in support of the findings that Baker, Coale

and Crince were discriminatorily discharged is predicated in a large measure upon a premise which it first states and argues. In the beginning we are told: "The Board's position with respect to the discriminatory discharges herein is that petitioner was opposed to having its employees represented by legitimate affiliated unions and, to foreclose such an eventuality, discharged the three employees who were most active in seeking to bring such unions into the plant."

The opposition to affiliated unions thus ascribed to petitioner is sought to be shown by three propositions: (1) petitioner's persistence in supporting the Council and permitting it to function as the representative of its employees subsequent to the passage of the Act in 1935; (2) by effecting a general wage increase in order to forestall its die shop employees from selecting the Die Sinkers as their representative; and (3) by discharging the three employees here involved, because of their legitimate activities in behalf of the outside unions. We are of the view that each of the reasons thus assigned are mythical and without the slightest foundation in the record. No doubt there are situations where company domination of a labor organization is proof of its hostility to an outside union, or at any rate that such hostility may be reasonably inferred therefrom. No such inference is reasonably deducible in the instant situation. The relation between petitioner and the Council, heretofore briefly shown, dispels any such inference. There was not the slightest evidence of domination or interference except as might be inferred from the meager financial and other support which petitioner rendered the Council. There was no proof and the Board did not find that petitioner was responsible for the organization of the Council but at the most merely permitted it to exist under the circumstances related. Moreover, the evidence is overwhelming to the effect that petitioner at no time evidenced any hostility toward an outside union or interfered to any extent ·or degree with any legitimate activities of such.

Neither is there any merit in the contention that petitioner effected a general wage increase in order to forestall union activities. On April 5, 1942, a general wage increase of 10c per hour was granted to all die sinking employees. We do not understand that any complaint is made concerning this increase, for, as the Board in its

decision states: "The evidence does not establish that the respondent was aware of the existence of the organizational efforts of the Die Sinkers at the time of the granting of the wage increase." Another wage increase was allowed on April 27, 1942. Perhaps it would be more accurate to state that this was a change in the wage system. Theretofore, wages were involved in a bonus system and this was changed to an hourly rate.

The Steelworkers did not start their organizational activities until January, 1943, and certainly a wage increase allowed April 27, 1942, was not for the purpose of forestalling such activities. The Die Sinkers began their organizational activities among the employees in the die shop in the spring of 1942. On April 17, 1942, a petition was filed with the Board for investigation and certification of it as a bargaining agent for the employees in that department. Petitioner consented to an election for such purpose, with the result that an election was held under the jurisdiction of the Board in May, 1942, in which the Die Sinkers' union was unsuccessful. It also appears that Coale and Crince participated in the conduct of this election and that this was the first time petitioner had knowledge that they were members of the union. Thus it appears that the so-called wage increases were allowed at about the same time this election was had. Again, it is pertinent to note that there is not a scintilla of direct evidence that petitioner interfered in any manner with the conduct of this election; the direct evidence is all to the contrary. It should also be noted that petitioner was not charged with any unfair labor practice in this respect, but the unfavorable inference which the Board draws is sought to be utilized in support of its finding of discriminatory discharges.

Considering the circumstances under which this pay change was allowed, we are unable to discern any justification for the Board's inference in this respect. The record discloses without any contradiction that Harold F. Wood (petitioner's general manager) in April, 1942, held a separate meeting with each shift in the die shop for the purpose of ascertaining the cause for dissatisfaction existing in such department. Following such meetings, Wood conveyed to the employees of this department, through Coale, the request that a committee be appointed by them for the purpose of conferring with him in an effort to adjust

any grievances which they might have. A committee of five members was thus appointed, which included Coale and Crince (alleged to have been subsequently discriminatorily discharged). This committee first met with management on April 17, 1942. It developed at the meeting that the chief complaint was the bonus system of payment which had been in existence in the plant for many years. Subsequently, other meetings were held and an agreement was reached between this committee and management that the bonus system be abolished and an hourly rate be substituted therefor. An hourly rate proposed by management was agreed to by the Die Sinkers to become effective the next following pay period, May 3, 1942. Thus it appears without dispute that the hourly rate of pay was substituted for the bonus system at the express request of the employees, including Coale and Crince, in an attempt by management to eradicate their dissatisfaction with the existing system. Notwithstanding these circumstances, the Board infers without any justification, so we think, that the reason for this increase or change in pay system was to interfere with the activities of the Die Sinkers. We agree fully with the statement of the Trial Examiner, "There is nothing in the record that connects these meetings or the wage changes that followed, with the Die Sinkers' 'organizational activities.' "

The third element of the Board's premise, that is, that petitioner's alleged opposition to the unions is shown by the discharge of the three employees involved, goes directly to the heart of the present controversy. Obviously, such discharges cannot be relied upon to show petitioner's opposition to the union and at the same time petitioner's opposition to the union relied upon to show that the discharges were discriminatory.

It follows that the premise which the Board has erected as a prelude to its discussion and finding that the discharges were discriminatorily made is without substance and cannot be accepted. As already stated, the Board's decision concerning the discharges of Baker, Coale and Crince rests to a considerable extent upon the basis of petitioner's asserted opposition to unions. Our conclusion that this basis is nonexistent is well nigh fatal to the Board's case. We doubt even if the Board would contend that the record justifies its findings

that the discharges were discriminatory without this basis of petitioner's alleged opposition to outside unions.

■ Under the circumstances presented, we think it is unnecessary to engage in a detailed discussion of the evidence concerning Baker, Coale and Crince as it relates to the reason for their discharges. Briefly, Baker was engaged in the heat treating department and his work in the main consisted in handling airplane propeller blades as they were being subjected to a heat treating process. The blades are fed into a furnace and by a mechanical process are carried through the furnace to and out a rear door. This is a continuous process and requires the undivided attention of the operator. The process is carried on according to an exact formula, and any substantial departure therefrom is reflected in the quality of the material produced. As stated by the Trial Examiner: "Notwithstanding this, many of the unloading attendants at the furnaces indulge in the practice of 'cheating', by reaching into furnaces and pulling out not only the forging that is ready to be discharged, but several of those nearest the end, so as to produce a 'lag' of several times the period usually expiring between the orderly and regular discharge of the pieces. In this manner an unloader, if his furnace is charged with slow moving pieces, can obtain 15 or 20 minutes of additional idle time but at the expense of the quality of the articles being treated."

Petitioner's plant is operated on a seniority basis which allows an employee with seniority rating certain preferences over one with a lower rating. The Examiner stated: "Baker definitely was a malcontent in the plant, constantly complaining about his assignments or other matters, and almost daily calling attention to his dissatisfaction or his disregard for his job by his complaints or by other conduct which brought him to the attention of his supervisors."

The Examiner also found that Baker was derelict in the discharge of his duties in numerous respects, such as loafing on the job, talking to other employees while they were at work, and generally interfering with production. The Examiner also found that Baker was guilty of "cheating" and that while other workers indulged in this same practice to some extent, "Baker was an outstanding offender in this regard, and not

only expended the time which he gained in this manner by talking to other men who were on productive operations, but also caused a substantial number of the pieces going through the furnace to be scrapped because of inadequate heat treating." The Examiner also stated: "There appears to be no question but that, in the opinion of practically all the supervisors who came in contact with Baker's work, and in the minds of numerous of his co-workers, he was a disturbing influence and, by interfering with the other men when he himself was not busy, had a deterring effect upon getting maximum production from the operations."

The record discloses that Baker's conduct was of great concern to management which, because of the war and its contracts with the government, was charged with a high degree of responsibility. Baker was implored and beseeched in vain to correct his ways and to do his part. Finally, on June 19, 1943, the situation had become so critical that Baker was taken to the office of Superintendent Wood. In the conversation which ensued, Wood accused Baker of interfering with the quality of production in the heat treating plant. Among other things, Wood said, "We have evidence that you were off your job talking to men who were working on the job and passing out union cards." Baker responded, "You can't prove it." Wood said, "Well, what if I told you that any number of men could come over here and testify that you had handed them a card?" Baker responded, "Yes, I did it, but you can't prove it." Wood thereupon informed Baker that "in view of his attitude and the trouble he had caused in that department," he was discharged.

Nelson, Baker's immediate foreman, was advised of the discharge, and in making out the discharge slip stated the reason therefor, "Soliciting union membership during working hours which interfered with proper control of the quality of the heat treatment of vital aircraft forgings." The Board attempts to confine the issue as to the discharge to that specifically stated. In this manner it seeks to escape the voluminous testimony that Baker was a general troublemaker and conducted himself without the slightest regard for the duty which he owed petitioner, as well as his country, in a period of great stress. As stated by the Examiner, his conduct was such as to give rise to the question, "Why was the man tolerated as long as he was?"

The Board makes certain concessions which strongly militate against its finding that Baker was discharged because of his union activities. The decision states: "A careful weighing of the evidence discloses that Baker at times has been lax in his conduct and inattentive to his duties." The Board points out that Baker denied that he had solicited on behalf of the union at times when he should have been applying himself to his duties and finds "there is no evidence to the contrary." This is a misapprehension of the record because there are a number of witnesses who testified that Baker solicited on company time. Moreover, the Board found: "However, Baker solicited other employees while they were working." We think it is immaterial whether Baker solicited on his own time or on company time for the reason, as the Board admits, the employees solicited were on company time, which supports petitioner's contention that he was interfering with the work of his department and thereby with production.

The Board in its decision concedes that Baker "cheated" by hastening the passage of forgings through the heat treatment furnace but excuses the seriousness of this practice by pointing out that other employees were also guilty. It apparently overlooks the testimony upon which the Examiner was led to observe that Baker in this respect was "outstanding." Whether the Board is complaining because petitioner failed to discharge all of its employees who were "cheating" or only because it discharged Baker as the ringleader is difficult to determine. The Board in its decision also admits that Baker "engaged in conduct which called for a measure of disciplinary action." It then expresses the view that the discipline imposed was too severe. We think that Baker's discharge was justified even on his misconduct as found by the Board. Furthermore, we are of the view that the measure of the discipline is not the proper concern either of the Board or of this court. In other words, whether petitioner committed an unfair labor practice is not dependent upon the measure of discipline which petitioner saw fit to impose.

The Board, in response to petitioner's contention that Baker's union activities interrupted production, makes the astounding denial that "Baker's union activities caused a serious interruption of production." In other words, the Board appears to concede that Baker caused some inter-

ruption but that it was not serious.[1] In our view, any interference, slight or otherwise, damaging to the war effort was serious, and any employee who deliberately indulged in such practice, as the Board concedes Baker did, should have been discharged forthwith.

■ The Board finds that Baker was discharged without warning. The Board's brief, however, concedes that he was warned on at least one occasion. We think the proof shows that he was warned on at least three occasions. At any rate, the proof shows that petitioner was extremely tolerant with Baker in its effort to persuade him to change his ways. Furthermore, we think it is immaterial whether he was warned one time or three times or not at all. We know of no law which requires an employer to warn an employee, admittedly a "cheater" against his government, in order to effect his lawful discharge. The Board also attempts to bolster its finding of Baker's discriminatory discharge because the reason assigned on his discharge slip was directed at his union solicitation which interfered with production. It appears to be the position of the Board that no other reason is proper for consideration. In some instances perhaps an inference might arise against an employer which subsequently assigns reasons for a discharge other than those given at the time it was made. No unfavorable inference, however, can arise under the circumstances of this case. The record shows beyond all controversy that Baker's interference with production by union solicitation was the culmination of a long series of events of Baker's own making. The immediate cause of his discharge was merely the "last straw which broke the camel's back." As already stated, that he should have been discharged long before he was is plain. To have postponed it longer might, and we think would, have laid petitioner open to the charge of being derelict in its responsibility to the war effort.

■ Coale and Crince, as already shown, were discharged August 9, 1943. For many years they had been employed as die sinkers. At the time of their discharge and for months prior thereto, the war was in its most critical stage. Dies are the "bottleneck" of a forging operation. During the period involved, petitioner was unable to meet its production schedules and was having difficulty in delivering sufficient forgings to keep the plane manufacturers' production line supplied. During the summer of 1942, the die shop seriously reduced its rate of production from peacetime standards and from the known capabilities of the men. This started shortly after the company converted from a bonus system of pay to one of flat hourly rates in the die shop, hereinbefore discussed. As heretofore pointed out, Coale and Crince were among the leaders who demanded that the system of pay be changed. Also as pointed out, this change was made about the time the Die Sinkers' union sought by an election to become the bargaining agent for the men employed in that department. Again the Board strongly relies on the inference that this increase or change in pay was a move on the part of petitioner to interfere with union activities. We have heretofore considered this incident and concluded that there is no justification for such inference.

We reiterate that there is no proof that petitioner interfered in any way with the activities of the union or the rights of its employees with respect thereto. The testimony is overwhelming to the effect that petitioner's desire and purpose was to maintain and if possible increase production. The meager testimony relied upon by the Board does not show any hostility toward the union, but only petitioner's insistence that its employees, union or otherwise, give their best efforts to the important work in which they were engaged. The fact that some who failed in this respect were members of the union is purely incidental.

There is no dispute but that Coale, Crince and one Olsen in particular were dissatisfied with the hourly rate which had been substituted at their request for the bonus system. Without going into detail, we think that it may also be safely observed that there is no question but that these men advocated a slow-down in work among the employees of this department. Neither is

---

[1] The Board in its brief, in response to petitioner's argument that Baker's misconduct was "outstanding," as found by the Trial Examiner, and in support of its contention that his discharge was discriminatory, argues that his conduct did not "seriously" interfere with the work of other employees, that his interference did not cause a "serious" loss of production, that he did not cause "undue" spoilage of materials, and that petitioner did not prove that Baker was "enormously" delinquent. We think this argument is without substance and must be rejected.

there any question but that production materially decreased. Numerous conferences were had between Wood and the employees of this department regarding this decreased production and Coale and Crince were on numerous occasions urged not only to do a full day's work themselves but to advise their fellow employees to do likewise. Coale and Crince also urged the apprentices in the department not to sign an apprenticeship agreement submitted to them by petitioner. True, this was denied by Coale and Crince; in fact, any support found for the Board's order as to these two discharges is based almost entirely on their testimony. The Trial Examiner who heard Coale and Crince stated as to their testimony: "In reply to a number of questions on various subjects put to them by the Trial Examiner, bearing on vital matters, their testimony was either incredible and preposterous on its face, or clearly shown by other credible testimony to have been deliberately falsified. For these reasons little if any weight is given to any of the testimony of either Coale or Crince when there is credible testimony to the contrary."

We have read their testimony and while, like the Board, do not have the advantage of seeing and hearing them testify, we agree with the Examiner that their testimony is so incredible in material respects as to be unworthy of belief; and we think it furnishes no substantial support for a finding based thereon. The Examiner found: "During June and the early part of July the discussions concerning the unions continued in the die shop on both company time and property and were led primarily by Coale, Crince and Olsen. Up to this time the company had promulgated no particular rule prohibiting the discussion of union matters during working hours. The chief concern of management was the prompt and maximum production of dies and the forgings made from them. There were, however, well known but unwritten prohibitions which applied, not to solicitation of union interest on company time or property, but to any conduct which would tend to cut down or interfere with the much needed production which was well known to be devoted exclusively to the war effort. At that time the primary forgings being produced by respondent (petitioner) were certain crankshafts and related parts for aircraft motors, which were available from no other source and were necessary to maintain the aircraft production program that had been geared to the European invasion plans. By July 10, not only had the situation in the die shop not improved but it had been aggravated by the persistent activities of Coale, Crince and Olsen."

On July 10, Wood called Coale, Crince and Olsen to his office and talked to them separately. The Trial Examiner credits the testimony of Wood as to what was said at this meeting, and the Board does not discredit Wood's version but draws the inference therefrom that it shows his animus toward these three men. They were each warned in substance that any further activities in regard to the Die Sinkers' union which interfered with production would result in a discharge. They were further warned that their urgings upon the other men to slow down production were having a demoralizing effect on the war effort and that such practices would not be tolerated in the future, and a continuation thereof would result in immediate discharge. At the same time, it was pointed out to each of them that membership in the union was of no concern whatever to petitioner; that the law granted that privilege and that it would not be interfered with in any way. They were also informed that activities off company property were of no interest to petitioner and that if they desired "to make a speech in behalf of the Die Sinkers' Conference we would be very glad to erect a platform * * * for their convenience." They were further told that this was the final warning on this subject. On July 18, Olsen was given his release at his own request and at the time of the hearing was employed elsewhere. There is an abundance of evidence, as found by the Examiner, that Coale and Crince continued their objectionable activities, and the Examiner found: "It is found, therefore, that neither Coale nor Crince observed the warning of July 10 and that thereafter, during working hours, they discussed union matters with other employees, discouraged apprentices from executing the proposed apprenticeship training contracts, and advised them against giving their respective jobs the benefit of their full production efforts." Their continued transgressions were reported by their supervisors to Wood who investigated the reports and decided that they were true.

Both men were discharged on August 9, with identical discharge slips showing as the reasons therefor: "Urging slow down on work to apprentices which interferes

seriously with war efforts. Influencing apprentices not to sign apprentice contract. Urging various shop employees to sign union contract on company property."

We do not understand the Board to disclaim, at any rate there is no finding contrary to that of the Examiner, that Coale and Crince interfered with production by advocating a slow-down in work and by interfering with other employees by talking union matters and soliciting for union memberships on company time. Rather, the Board attempts to exculpate Coale and Crince upon an ingenious but fallacious theory that other employees indulged in similar conduct but were not discharged. The Board does not state what petitioner should have done under the circumstances with which it was faced. Maybe petitioner should have discharged all of its employees who had participated in any manner in such activities. To have done so, however, would have crippled even further the essential work in which petitioner was engaged.

Furthermore, as the record discloses, these two men were the recognized leaders in the commission of the objectionable activities even after they had been expressly warned that a continuation of such would lead to their discharge. As stated by the Trial Examiner: "As in the case of the discharge of Baker, the question arises as to why respondent (petitioner) should have tolerated the men during the long period of unsatisfactory conduct before discharging them." In connection with this observation by the Examiner, it is pertinent to observe that one of the reasons assigned by Wood for such toleration was "that both of these men were old employees of our company and we wanted to exhaust the last effort to try to get the situation straightened out." A study of this record is convincing that Wood's explanation was honest and sincere.

We think it is unnecessary to discuss further the circumstances connected with the discharge of Coale and Crince. They have all been considered and we are unable to agree that there is any substantial basis for the conclusion that they were discriminatorily discharged. It is almost inconceivable to think that petitioner in order to rid itself of these admitted troublemakers (and this includes Baker) would have resorted to a violation of the Act when it had numerous justifiable reasons for their discharge. The record overwhelmingly discloses, with no evidence of any probative value to the contrary, that the discharge of Baker, Coale and Crince was not only justified but required. Petitioner is entitled to be commended rather than criticized for its action in this respect.

Little need be said concerning the Board's finding that petitioner interfered with, restrained and coerced its employees in violation of Section 8(1) of the Act. Here again the Board relies largely on what it terms the illegal discharge of Baker, Coale and Crince, and petitioner's action in granting a wage increase. We have already discussed these matters and reiterate that in our view no reasonable inference can be drawn which will support the Board's finding in this respect.

One other matter which the Board relies upon is the testimony of Olsen that at the time he was quitting foreman Cole stated to him that if he "wanted to come back there at any time he would get me back, providing I would forget about the union and come under the company's terms, according to their terms." Cole specifically denied making any such statement. The Trial Examiner disbelieved Olsen and credited Cole's denial. It appears that the Board credited the testimony of Olsen, although we find no specific statement or finding to that effect. Even assuming, however, that Olsen told the truth, it represents a single and isolated instance where anybody connected with management is shown to have made a statement in disparagement of the union. In our judgment, it is insignificant and furnishes no substantial basis in support of the conclusion that petitioner violated Section 8(1).

The portion of the Board's order directed at the Employees' Council is approved and enforcement allowed. The order in all other respects is set aside and enforcement denied.