## A. E. STALEY MFG. CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 7301.

Circuit Court of Appeals, Seventh Circuit.
Nov. 14, 1940.

On Request for Decree of Enforcement
Jan. 30, 1941.

Rehearing Denied Feb. 26, 1941.

TREANOR, Circuit Judge, dissenting in part.

———◇———

Carl R. Miller and Chas. C. Le Forgee, both of Decatur, Ill., for petitioner.

Chas. Fahy and Robt. B. Watts, National Labor Relations Board, both of Washington, D. C., for respondent.

F. R. Wiley, of Decatur, Ill., for intervener Independent Starch Workers Union.

Joseph Padway and Herbert S. Thatcher, both of Washington, D. C., for intervener United Grain Processors.

Before MAJOR and TREANOR, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

This case is here upon petition by A. E. Staley Manufacturing Company (hereinafter referred to as "petitioner") to review and set aside an order of the National Labor Relations Board, (hereinafter referred to as the "Board") issued against petitioner pursuant to 29 U.S.C.A. § 160 (c), Section 10(c) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq. The Board, in its answer, has requested enforcement of its order.

Complaint was issued on December 2, 1938, upon charges filed by United Grain Processors, Local No. 21490 (hereinafter referred to as "United"), a labor organization affiliated with the American Federation of Labor. In addition to jurisdictional allegations, the complaint alleged, in substance, that petitioner had dominated and interfered with the formation and administration of, and contributed support to three successive labor organizations of its employees, namely, the Employees' Representation Plan (hereinafter referred to as the "E.R.P."), the Staley Employees' Organization (hereinafter referred to as the "S.E.O."), and the Independent Starch Workers' Union (hereinafter referred to as the "I.S.W.U."), and had otherwise interfered with its employees' rights of self organization, thereby violating Section 8(1) and (2) of the Act. Petitioner, by answer, denied that it had engaged in any unfair labor practices. A hearing was had before an Examiner from December 12 to 16, 1938, participated in by the Board, petitioner, and the I.S.W.U. On February 1, 1939, the Trial Examiner filed an intermediate report finding that petitioner had dominated, interfered with, and supported the E.R.P. and the S.E.O., but not the I.S.W.U. The United filed exceptions to the intermediate report insofar as it related to the I.S.W.U. Thereafter, all the parties filed briefs and participated in oral arguments before the Board. On April 2, 1940, the Board issued its decision setting forth its findings of fact, conclusions of law, and order, wherein the charges, as made in the complaint, were sustained. Petitioner was required to cease and desist from the unfair labor practices complained of, and to withdraw all recognition from, and completely disestablish the I.S.W.U. as the representative of its employees for the purpose of collective bargaining; to refuse to recognize the E.R.P. and the S.E.O. as such representatives; to reimburse each employee for dues which were checked off his wages while a member of the S.E.O. or the I.S.W.U., and to post appropriate notices.

Petitioner is a Delaware corporation, having its principal place of business in the City of Decatur, Illinois. It is engaged in the manufacture, preparation, process, sale and distribution of corn and soybean products. Petitioner employed between eleven and twelve hundred workers, paid on an hourly basis; approximately one hundred ten foremen and assistants, and some two hundred in the administrative office and sales department, all paid on a monthly basis.

The chief issue presented is whether there is substantial support for the Board's finding that petitioner dominated and interfered with the formation and administration of, and contributed support to, the I.S.W.U. This is so as we view the situation for the reason that both the E.R.P. and the S.E.O. had, for all practical purposes, ceased to be labor organizations and, without dispute had been denied recognition by

petitioner as a bargaining agent prior to the time of the organization of the I.S.W.U. In view of the great stress laid upon the character of these prior organizations by the Board, however, it appears necessary to make some review of their history and activities.

Prior to the middle of 1935, there was no labor organization at petitioner's plant. About that time, and apparently prior to the passage of the National Labor Relations Act, the E.R.P. was organized. At the request of one Leo Richards, an hourly paid employee, permission was obtained from petitioner's president to circulate petitions in the plant requesting that such an organization be formed. The petitions were mimeographed on petitioner's machine. Richards was informed at that time by petitioner's president that if such an organization was formed, it must be as the result of the voluntary action of the employees. At the request of the employees, petitioner's president and personnel manager appeared at the organization meeting, where petitioner's neutral attitude was explained. On July 11, 1935, petitioner addressed a letter to all employees, outlining the situation with respect to such organization. The Board stresses the statement of petitioner's opinion as expressed in this letter "that it will prove to be a benefit to the employees and to the management as well." That expression, however, is followed by the following statement: "If we do have a plan, it will be your plan, formulated and approved by you or your representatives. It will not be a company union or dominated by the company. We are advised by counsel that such a plan is entirely legal. * * * If you do not want it, there is no obligation of any sort on anyone to sign. We want to make it clear that the company has not and will not use any form of coercion or pressure on anyone in a thing of this kind." About the same time there was distributed in the plant by the personnel manager, with the consent of petitioner's president, a pamphlet entitled "What is an Employee Representation Plan"? The information contained therein was in question and answer form. The pamphlet is too lengthy to set forth here, but the Board contends that its purpose was to point out the advantages of an employees' representation plan over unionism. We have carefully read this pamphlet and we doubt if it is susceptible of such a construction, but if so, it points out with equal or greater force the advantages of such a plan over a company union.

Again, in a memorandum dated July 19, 1935, petitioner made certain suggestions to its employees with reference to the procedure which might be used in connection with the organization. This memorandum concluded as follows: "We wish to make it clear that this memorandum is merely a suggestion which you are entirely free to accept or reject. We also wish to make it clear that the plan and method of election of your representatives is entirely in your hands. We will offer advice only if requested by your temporary representatives." Again it is pointed out that petitioner's president agreed with the temporary representatives to defray all expenses of the plan's formation. In this connection it also should be stated that this was done at the express request of the employees. The Board concludes that these and other facts, not necessary here to relate, "conclusively demonstrate that the E.R.P. was petitioner's creature," and, therefore, constituted a violation of the act. That it violated the act' is not disputed by petitioner, but it is argued that petitioner acted in the utmost good faith in the matter, and that as soon as petitioner discovered that mimeographing, financial support, and similar services rendered by petitioner were objectionable, it immediately notified the members of the E.R.P. that such assistance would be discontinued. In this connection, petitioner's president testified: "At the time the employees' representation plan was established, there was no interpretative decisions of the National Labor Relations Board then issued by the Board. There had been no Board cases or no test cases at the time it was established." He further testified in substance that they were aware that the act prevented any sort of domination or control of a labor organization, but they did not think it was contrary to the spirit of the law for the company to render certain services, such as the printing of ballots, printing of minutes, or permission to meet on company property when requested by the employees.

Shortly after this support was discontinued, the S.E.O. was formed. Petitioner contributed no money or material to this organization, but at the request of its representatives, typed certain minutes of joint meetings between representatives of the S.E.O. and representatives of petitioner. The S.E.O. was sponsored by cer-

tain employees, some of whom had been active in the E.R.P. Their activities were carried on under the direction of an attorney who had no connection with petitioner and who was employed and paid for his services by the employees. In drafting the by-laws of the new organization, certain features of the E.R.P. were retained, and it is this feature that the Board criticizes and from which it argues that the S.E.O. was merely a continuation of the E.R.P. and, therefore, company controlled. It seems to us, however, that this theory has little, if any, foundation in view of the testimony of John Talley, a member of the United, one of the Board's principal witnesses and who served as a committee member in the early stages of the S.E.O. According to his testimony, he conferred with petitioner's president as to how far they could go in changing the E.R.P., and that he was told "as far as we wanted to." Talley also testified that petitioner's president refused a request that petitioner pay printing bills, including notices and membership cards; that he refused a committee request that representatives of the S.E.O. be placed on straight day work so that they might more easily take care of their organization activities, and promised to take under advisement a request that dues of the members of the S.E.O. be deducted from the payroll. At any rate, the S.E.O. was perfected and was recognized as the collective bargaining agent of petitioner's employees.

About this time petitioner was advised by letter from the Board, dated March 7, 1938, that a charge had been filed alleging the commission of an unfair labor practice in the formation and domination of a labor organization, and that Examiner L. J. Disser, to whom the case had been assigned, would visit petitioner to discuss the facts. Disser arrived, and on March 9, a conference was had with petitioner's president, wherein petitioner's president advised Disser that he was confident petitioner had not violated the act but that it would be glad to cooperate in a complete investigation of the charges; that all of petitioner's records were open to him, and that petitioner hoped he would go into the matter extensively and carefully. All requested information, including a copy of the agreement between petitioner and S.E.O., was furnished him. Disser informed petitioner that in his opinion no independent labor organization could exist without some form of company support, and that in every instance where the Board had proceeded against an independent organization, the Board had never yet failed to find sufficient evidence with which to destroy the organization. He then requested petitioner to disassociate itself from S.E.O. and to post a bulletin on its bulletion board to that effect. The following day he again made the same request and stated to petitioner that it had maintained such good wages and such excellent working conditions that the American Federation of Labor had nothing to promise petitioner's employees; that the American Federation of Labor had to be able to make some promises in order to accomplish their organization; that the existence of an independent organization made the task of the American Federation of Labor extremely difficult in view of the wages and working conditions existing at the plant and that, therefore, the independent organization had to first be destroyed and that he was there for that purpose. He requested, and was granted, permission to go through the plant and talk with the employees. Later, he reported to petitioner that he found the men equally divided in sympathy, half of them preferring the S.E.O. and the other half either favoring the American Federation of Labor or wanting no labor organization at all. Disser talked with many of petitioner's employees, and at least five witnesses testified as to conversations had with him. The substance of their testimony is that they were told by Disser that the S.E.O. was an illegal organization; that they would be better off with the A.F. of L.; and that this was just "good meat" and "bad meat." When asked what he meant by the latter expression, he replied: "Well, good meat has got the Government seal on it and bad meat hasn't." Again he referred to the company as "bad meat," and stated that the A. F. of L. could take the same contract as the S.E.O. had and let the Board put the Government stamp on it and go right on with the same working rules; the only difference being that the employees would be backed by the A.F. of L. instead of S.E.O.[1]

---

[1] The testimony with reference to the activities and statements of Mr. Disser is not disputed. For some reason not disclosed by the record, he was not called

In response to Disser's request that petitioner disassociate itself from the S.E.O., petitioner decided to issue a letter to all of its employees explaining the situation. The letter was prepared and submitted to Mr. Disser in order that he might correct any misstatements. He made certain corrections and the letter, under date of March 11, 1938, was mailed to each of petitioner's employees explaining petitioner's labor policy[2] and the situation presented by Disser's visit and activities at the plant. The letter concluded by advising the employees of the difficult position occasioned by Disser's request. It was pointed out that a refusal might place it in a position of not cooperating with the Board and a compliance might subject it to the charge of interfering with the employees to bargain through the S.E.O. Enclosed with each letter was a copy of the Board's letter to petitioner, dated March 7, 1938, and also copy of a letter in reply thereto addressed to Disser under date of March 11. In the latter letter, the predicament in which the company was placed was pointed out and the letter concluded: "Our company desires to co-operate to the fullest extent with the National Labor Regulations Board in determining the involved question. We have endeavored to comply with both the letter and the spirit of the law and to maintain at all times a fair labor policy toward our employees. We regret that conditions are such that immediate decision on your request is impossible. We shall endeavor to expedite a decision without undue delay."

Shortly thereafter, petitioner decided that it should not comply with Disser's request. Petitioner's president, in this connection, testified: "* * * We did not want to take that responsibility of passing a death sentence on any labor organization, and that it should be a matter for the employees themselves to decide, if they didn't want it; or if there was anything wrong from a legal nature with the organization the National Labor Relations Board was the proper authority to make that decision and not the management."

After receiving the letter of March 11, 1938, one Rinehart, an hourly paid employee of petitioner, upon his own initiative, circulated a petition addressed to petitioner's president, signed by over 800 employees, requesting that petitioner continue to recognize the S.E.O. as the collective bargaining agent for petitioner's employees. A little later Disser made another visit to the plant and was shown this petition. Certain of petitioner's employees, moved by Disser's attitude toward the S.E.O., and the further fact that the machinery provided by that organization for bargaining with petitioner was too cumbersome, decided that a new labor organization should be formed. Consequently, 24 employees, representatives of the S.E.O., met in May and voted to dissolve that organization, and notified petitioner in writing that its agreement with petitioner, entered in July 1, 1937, was terminated, effective July 20, 1938. Upon receiving this notice, petitioner on the following day addressed a letter to all of its employees advising them of the notice and stating that pursuant thereto, petitioner would no longer recognize the S.E.O. as a collective bargaining agency. Thereupon, petitioner had no further dealings with the S.E.O. The assets of the latter were liquidated and the proceeds divided among its members. From July 20, 1938, to August 19, 1938,

---

by the Board as a witness. We are advised in a footnote to the Board's brief that he denied, by an affidavit filed with the Board, making such statements or engaging in such conduct. This affidavit is not in the record and we assume was made subsequent to the hearing. At any rate, it is not before us and can not be considered.

2 "1. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection.

"2. The company will bargain collectively with any labor organization lawfully authorized so to act.

"3. The company will not dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it.

"4. The company does not care what organization represents the employees, and has no right under the law to express such preference if it had one. Our policy is entire neutrality.

"5. The company desires to comply with both the letter and the spirit of the National Labor Relations Act, and desires to cooperate to the fullest extent with all lawful authority."

there was no recognized collective bargaining agency in existence at petitioner's plant. I.S.W.U. was recognized by petitioner on August 19, 1938.

This constitutes the salient facts with reference to the so-called background upon which the Board places great reliance in support of its decision that I.S.W.U. was a dominated organization. We now come to the facts concerning the organization of the I.S.W.U. as relied upon by the Board in support of its decision in·connection with, and in addition to, this background. Shortly subsequent to Disser's visit to petitioner's plant, a small group of petitioner's employees started the movement with reference to the organization of the I.S.W.U. The movement appears to have been initiated by two employees, Cleve Ginder and John Talley. These and other employees conferred with Attorney C. C. Martin of Decatur regarding the formation of such a union. Martin was connected in no way with petitioner, and neither he nor the employees had talked to, or discussed the proposed organization with petitioner or any of its officials. The I.S.W.U. was formed under the direction and advice of the attorney. The first knowledge petitioner had concerning this new organization was in June, 1938, and the information was given to petitioner's president by Disser. On July 21, 1938, one Stark, an employee, came to the office of petitioner's president and informed him that the I.S.W.U. was being formed and that it had a majority of the employees, and that in a short time it would be able to ask for recognition. He was told by petitioner's president that a request for recognition would have to be in writing and evidence supplied which would substantiate the claim of majority. On August 17, 1938, petitioner received a formal written demand from the I.S.W.U. demanding recognition. In connection therewith, a package containing membership cards was presented to petitioner's president, which he did not open. At his suggestion, the membership cards were turned over to a firm of certified public accountants in Decatur who checked the cards against petitioner's payroll and certified that they represented approximately 63 per cent of petitioner's employees. The accountants' fee of $100 was paid by petitioner.

August 19, 1938, petitioner granted exclusive recognition to the I.S.W.U. After the I.S.W.U. was recognized, a committee was appointed by the management of petitioner to meet with the committee from the union to work out a contract. Meetings were held during August, September, October and November of 1938, on the average of at least twice a week. At the request of the Union, petitioner agreed that it would recognize individual wage assignments directing it to pay the dues of members of the Union who signed such wage assignments to that organization, deducting such amounts from their wages. A contract between the Union and petitioner was still in the process of negotiation at the time of the hearing.

This, in brief, is a summary of the facts concerning the organization of the I.S.W.U. We will now make reference more in detail to certain incidents which the Board points out as significant. The Board, in its decision, referring to the organization of the I.S.W.U., states: "The general feeling among these employees was that the respondent (petitioner) preferred to deal with an inside union." The only evidence called to our attention in support of this statement is the testimony of Attorney Martin. He stated: "Now, there was some innuendo in the air that the company might rather deal with an independent union, but there was never any statement made to me that the company had said that. * * *" He further stated: "I believe that one or two of them—maybe some more of them, and I don't know who they are now—said that in their opinion they thought the company would rather have the independent union." And further: "I can't say what the feeling was. It was just an expression of opinion on the part of two or three." We do not think this testimony furnishes any support to the statement referred to in the Board's decision. The Board also stated: "In addition, the organizers expressed hostility to the idea of joining the American Federation of Labor when this was suggested by Martin." We find no evidence to support this statement, but even if so, we think it is immaterial. Certainly the employees had a right to be friendly or hostile to any labor organization, and in addition, their attitude was of no proper concern to petitioner, and certainly had no material bearing upon the charge. The Board stresses the fact that certain representatives of the S.E.O. participated in the organization

of the I.S.W.U. It is also a fact that some of the organizers of the I.S.W.U. later became organizers and officers of the United. (A.F. of L.) We do not think that any suspicion is to be cast upon the latter organization from such fact, nor do we think, under the circumstances of this case, that the I.S.W.U. is to be condemned for such reason.

▪ Another incident recited in the Board's decision has to do with the testimony of John Talley who testified with reference to a conversation with one Robinson, in which the latter told Talley that he and one Garner had a conversation with an official of petitioner and that the latter told them that if they threw out the S.E.O. they would never get another organization. Petitioner's official denied making this statement (the Examiner credited such denial). Garner and Robinson were not called as witnesses. Such testimony can carry no weight. In the first place it is hearsay, and in the second place, if such a statement was made, it was according to the undisputed evidence clearly contrary to petitioner's instructions to its officials and foreman, made known many times to them as well as to all of petitioner's employees.

▪ Another circumstance referred to in the Board's decision, and stressed in its argument, relates to a visit made to petitioner's president in June, 1938, by Harold Behnke, Secretary of United. The secretary told petitioner's president that some of the employees were afraid to join the United for fear of company reprisals, and requested permission to post a notice on petitioner's bulletin board to the effect that petitioner didn't care if the men joined the A.F. of L. The request was denied for the reason, as stated, that it would put the company in a discriminatory position, but he was told that petitioner's policy was set forth in its letter sent to all employees. (This is the letter of March 11, 1938.) Petitioner's president also told the secretary that if any employee was in doubt as to petitioner's neutrality position that he would be glad to personally assure the employee as to his rights. We are unable to discern how this incident creates any inference against petitioner. If anything, it is in its favor. It is a circumstance showing neutrality as between the contending forces rather than hostility toward the United. (In this connection, the testimony

of Harold Behnke, later referred to, is material.)

▪ There is also relied upon the act of petitioner in paying for the services of the accountants in examining the membership cards of the I.S.W.U. with a view of determining if such organization had a majority of petitioner's employees. The accountants were in no way connected or related to petitioner. When the cards were presented in support of the Union's claim that it represented a majority, it would appear that petitioner was confronted with the duty of ascertaining if they were sufficient to support the Union's contention. No doubt it could have properly turned the cards over to its own office force for the purpose of making such determination. Instead of this it employed the accountants to render this service for it. Again, it would appear to us that this is a circumstance in favor of petitioner rather than against it. By handling the matter as it did, petitioner received no information as to who of its employees had failed or refused to join the I.S.W.U. If its attitude was discriminatory, or it was interested in controlling this organization, it would appear that it missed an opportunity to obtain some valuable information. Having engaged the services of the accountants for a legitimate purpose, we do not think there was any stigma attached to its paying for such services.

▪ Another incident again has to do with the testimony of Talley who testified that on December 19, 1938 (four days before the hearing in this case), his foreman told him: "We was better off and that things would be a damned sight better under the present administration than they would be if we had a union in here, because the jobs would fill up more if we had a union." Talley also testified that he knew the foreman was making this statement as his own personal opinion. We are satisfied it could not have been otherwise, and if so, it is not binding upon the petitioner. Humble Oil & Refining Company v. National Labor Relations Board, 5 Cir., 113 F.2d 85, 92; Jefferson Electric Co. v. National Labor Relations Board, 7 Cir., 102 F.2d 949; National Labor Relations Board v. Ford Motor Co., 6 Cir., 114 F.2d 905, decided Oct. 8, 1940.

▪ Another circumstance urged by the Board in its brief is that "petitioner refused to disestablish the S.E.O. when re-

quested to do so by the Board representative." We confess our inability to find any logic in such an argument. We assume the Board's representative referred to was Disser. It is true he advised petitioner's president that the S.E.O. was illegal, but where was his authority to order its disestablishment? We know of no means by which that might be accomplished except by the order of the Board after hearing, but assuming that Disser had such authority, how could petitioner order the disestablishment of a labor organization, whether legal or illegal, bona fide or spurious? The most it could do was to refuse to recognize it as a bargaining agency. This it did. It was under no obligation and had no authority to do more.

■ Another argument advanced by the Board is that petitioner had failed to declare its neutrality as between the conflicting forces. In our judgment not only is this argument unsound, but it is in direct conflict with all of the testimony in the record. We have set forth heretofore petitioner's letter of March 11, 1938, which clearly and unequivocally stated petitioner's labor policy as fairly and plainly as it was possible to do. Ordinarily, such matters are brought to the attention of the employees by a notice on the bulletin board where they may or may not be seen. Here, however, a copy of this letter was sent through the mail to each individual employee. To think that the employees were not fully apprized of their rights and the neutral labor policy of the petitioner is to disparage their intelligence. We realize, of course, that this declaration of "labor policy" would be meaningless in connection with acts evidencing a contrary purpose, but the record is consistent with the policy thus declared. The witnesses for the Board, now officials of the United (A.F. of L.) refute any unfavorable inference in this respect. It seems pertinent to make brief reference to some of such testimony. John Sanders, President and Charter Member of United, testified that he had asked employees on petitioner's premises to attend A.F. of L. meetings; that he had posted notices of such meetings on petitioner's bulletin board; that he had solicited members for the A.F. of L. in the presence of petitioner's foreman, and that he had never been reprimanded or interfered with on account of such activities Harold Behnke, Secretary and Charter Member of United, testified that petitioner's president had told him that petitioner was neutral and didn't care with which organization its employees affiliated, that he had requested and received permission to post notices announcing A.F. of L. meetings and other business of that organization, and that the A.F. of L. was permitted to use the bulletin board the same as other organizations were using it. There perhaps was no employee in a better position to know of petitioner's policy than the witness John Talley, also a member of the United. He had participated in the organization of the E.R.P., the S.E.O., and the I.S.W.U., and had been active in the affairs of each. During the organization period of the I.S.W.U. he quit that organization and joined the United. He testified that so far as he knew, from July, 1935, down to the time of the filing of the complaint, petitioner had taken no action to restrain, prohibit or prevent any activity of the employees interested in, or affiliated with, any labor organization; that since he had become a member of the A.F. of L., he had solicited employees of petitioner to join such organization, and that he had never been interfered with or discriminated against because he had joined such organization, and that he understood the policy of petitioner to be that each employee should make his own choice as to a labor organization. Typical of his testimony are a few questions and answers which we set forth in a footnote.[3]

In this connection, it is also interesting and perhaps pertinent, to note that Disser,

---

[3] "Q. Now, Mr. Talley, have you solicited any of the employees of the Staley Company to join the United Grain Processors Union?

\* \* \* \* \* \*

"A. Yes, sir.

"Q. And you have never been interfered with by any of the management of the company? A. No, sir.

"Q. And you have never been told not to do that? A. No, sir.

"Q. And there has never been any bulletin posted on the bulletin board of the company instructing any employee not to do that? A. I never saw any.

"Q. And you know, do you not, that there have been bulletins of the United Grain Processors Union posted on the bulletin boards of the company announcing meetings?

\* \* \* \* \* \*

"A. Yes, sir.

"Q. You have never been discriminated against or had any reprisal on the

the Board's representative, was at petitioner's plant on numerous occasions during the period when I.S.W.U. was being organized. In fact, he was the first to report to petitioner as to the activities of the employees in connection with that organization. According to the undisputed testimony, he was hostile to independent and favorable to affiliated unions. It appears reasonable to assume that if he had detected any irregularities with this organization, he would have reported it to petitioner and furnished the Board with such information even though he failed himself to appear as witness.

▇▇▇▇▇ A study of this record is rather convincing that there is no serious dispute as to the facts. The attorney for the Board in oral argument before this court pointed out that the facts found by the Board differed in no material respects from those reported by the Examiner. The former, however, reached a conclusion opposite to that reported by the latter. While we recognize that the Board is not bound by the findings or conclusions of its Examiner, as is a court by its master or referee, and that its findings are conclusive if substantially supported, yet we think that where its conclusion rests on inferences, such can not prevail in face of direct evidence to the contrary. In the same connection, while the report of the Examiner is not binding on the Board, yet where it reaches a conclusion opposite to that of the Examiner, we think the report of the latter has a bearing on the question of substantial support and materially detracts therefrom.

The Board relies upon a number of cases, the foremost of which are National Labor Relations Board v. Newport News Ship Building & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219, and Westinghouse Electric & Mfg. Co. v. National Labor Relations Board, 2 Cir., 112 F.2d 657. We have studied those cases and do not think the rule therein announced relative to a successive independent union is applicable here. The court, in each of those cases, was dealing with a set of facts quite dissimilar to those here. The effect of the holding, as we understand, was that an inference or presumption was raised that the successor of a company dominated union was likewise dominated. In the Westinghouse case, the court, 112 F.2d on page 660, said: "* * * The theory is that in cases such as this, where an unaffiliated union seems to the employees at large to have evolved out of an earlier joint organization of employer and employees, the Board may take it as datum, in the absence of satisfactory evidence to the contrary, that the employees will suppose that the company approves the new, as it did the old, and that their choice is for that reason not as free as the statute demands. * * *"

We do not think such a theory can prevail in face of direct and uncontradicted evidence that petitioner's employees understood that they were free in theory and in fact to join any labor organization they desired. Whatever inference or presumption which may attach because of petitioner's relations with organizations preceding the I.S.W.U. is dispelled by the undisputed facts in connection with the organization and operation of the I.S.W.U. as a bargaining agent.

▇▇▇▇▇ In this connection it is also pertinent to point out that there is not a scintilla of evidence that discloses discrimination of any kind or character for or against any employee because of his attitude toward the I.S.W.U., or any other labor organization. That petitioner, in dealing with its employees, endeavored in good faith to comply with the provisions of the act, is hardly open to dispute. True, as conceded by petitioner, it, by certain acts, rendered assistance to the E.R.P. and the S.E.O., always, however, at the request of the members of those organizations, which were subsequently held by the Board to be circumstances upon which a finding of domination could rest. These acts,

---

part of the company because you joined the union, have you? A. No, sir.

"Q. Or because of any of your activities in any organization? A. No, sir.

"Q. And have you understood from the bulletins and what has been told you by the management that the employees of the Staley Company could make their own choice with reference to a labor organization?

* * * * * *

"The Witness: Mr. Staley, I believe, has stated that in a letter to each employee; that they could make their own choice.

"Q. Well, you understood that was the company policy, didn't you? A. Yes, sir.

* * * * * *

"Q. Up to the time of the filing of this complaint it was still your understanding that that was the policy of this company, wasn't it? A. Yes, sir."

however, in our judgment, do not impugn petitioner's good faith. We do not believe when the act was enacted that laymen, or lawyers called upon for advice, could have reasonably anticipated that the loaning of a typewriter or a mimeographing machine, or the permission granted employees to meet on company premises, and like services and favors rendered by an employer, would demonstrate employer domination and thus result in an unfair labor practice. In view of subsequent holdings, however, such acts on the part of the employer are recognized as improper. The good faith of petitioner and the fact that it, with the knowledge of its employees, eliminated such practices as soon as informed they were condemned by the Board, is another circumstance which contradicts the idea that any employer domination of the character described was carried over from the earlier to the latter organization.

We therefore reach the conclusion that the Board's finding and conclusion that petitioner dominated, interfered with, and supported the I.S.W.U. is without substantial support, and its order requiring petitioner to withdraw recognition, and to refuse to recognize the I.S.W.U. as the bargaining agent of petitioner's employees, is erroneous.

It would appear that the Board's order with reference to the E.R.P. and the S.E.O. is a useless requirement for the reason that those organizations apparently have ceased to exist of their own volition, and certainly petitioner has long since refused to recognize them as a bargaining agency. Nor can we conceive how there could be any likelihood of petitioner again recognizing them. They were illegal organizations, however, in the manner and to the extent pointed out heretofore, and we think it is within the province of the Board to order petitioner to refuse to recognize them as the representatives of any of its employees, and to post appropriate notices with reference thereto as is provided in the Board's order.

The Board's order which requires petitioner to reimburse its employees who were members of S.E.O. and I.S.W.U. for dues checked off by petitioner is, in our opinion, erroneous. We have heretofore, in National Labor Relations Board v. J. Greenebaum Tanning Co., 7 Cir., 110 F.2d 984, 988, concluded contrary to the Board's contention in this respect and we see no reason to alter or modify such conclusion.

Therefore, that portion of the Board's order as it concerns and affects the I.S.W.U.; and the requirement with reference to reimbursement of dues checked off, is set aside. Otherwise, the order of the Board is affirmed and enforcement ordered.

TREANOR, Circuit Judge (dissenting in part and concurring in part).

It was a close question whether there was substantial evidence to support the Board's finding that petitioner dominated, interfered with, and supported the I.S.W.U. But under the applicable decisions of the Supreme Court and other federal courts I am of the opinion that this court is not justified in holding that there was no substantial evidence to support such finding. Granting the correctness of the Board's finding such finding was adequate to support the order requiring petitioner to withdraw recognition and to refuse to recognize the I.S.W.U. as the bargaining agent of petitioner's employees.

I concur in the holding that the Board was without authority to require petitioner to reimburse its employees, who were members of S.E.O. and I.S.W.U., for dues checked off by petitioner.

On Request for Decree of Enforcement.

MAJOR, Circuit Judge.

Opinion in the above-entitled cause was filed November 14, 1940. Each side has submitted a proposed enforcement decree and each claims that its proposal is in conformity with the opinion. Briefs and arguments have been submitted which necessitate some further expression by us.

In a form of decree proposed by the Board, petitioner is ordered to cease and desist from—

"(a) Dominating or interfering with the administration of Employees' Representation Plan or Staley Employee's Organization, or with the formation or administration of any other labor organization of its employees, and from contributing financial or other support to Employees' Representation Plan or Staley Employee's Organization, or to any other labor organization of its employees;

"(b) In any other manner interfering with, restraining, or coercing its employees in the exercise of their right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and

to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the National Labor Relations Act."

The decree, as submitted, then requires affirmative action consistent with these paragraphs.

The Board argues that its proposal is proper in view of our opinion, while the petitioner argues to the contrary.

■ It is the position of the petitioner that inasmuch as the opinion held it was not guilty of dominating or interfering with any labor organization other than the Employees' Representation Plan and Staley Employee's Organization, it should not be required to cease and desist with the formation or administration of any other labor organization, or from contributing financial or other support to any other labor organization of its employees. Paragraph (a) is predicated upon Section 8 (2) of the Act, 29 U.S.C.A. § 158(2), and petitioner's contention is not without merit in view of the fact, as the opinion discloses, that petitioner ceased to recognize such organizations four months prior to the time when the complaint in the case issued. In view of the broad power of the Board in this respect, however, as construed by the courts generally, we are not justified in denying the validity of this paragraph. We think this is consistent with our holding in National Labor Relations Board v. Swift & Company, 7 Cir., 108 F.2d 988. See cases therein cited.

■ We do not agree, however, with the Board's contention as to Paragraph (b), which enjoins the interference with, restraining and coercing of petitioner's employees as guaranteed in Section 7 of the Act, 29 U.S.C.A. § 157. In National Labor Relations Board v. Swift & Company, supra, 108 F.2d at page 990, considering a similar provision, the court said: " * * * In truth, the conduct enjoined has no fair relation to the issue which was heard and determined by the Board. * * *" We

think that is clearly the situation in the instant case. Concerning the violation of Section 7, the Board, in its decision and order, said: "As we have already found that the respondent dominated and interfered with the formation and administration of the I. S. W. U. and contributed financial and other support thereto, we further find that the use by the respondent of the grievance machinery set up by it in conjunction with the I. S. W. U. operated in this instance as a device to interfere with, restrain, and coerce the employees in the exercise of the rights guaranteed to them in Section 7 of the Act, and that the respondent thereby interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act."

The opinion holds that the I. S. W. U. organization was not company dominated or controlled and that it was a valid, bona fide labor organization. No violation of Section 7 was charged or found except as the violation of 8 (2) might constitute a violation of 8 (1), and therefore a violation of 7. In other words, any violation of 7 was merely incidental to that of 8 (2). We are of the opinion that there is no reasonable excuse to now enjoin petitioner from any and all acts which might constitute a violation of Section 7, when the court has expressly absolved it from all unlawful conduct except domination of two labor organizations in violation of 8 (2) and as to which recognition was denied prior to the hearing.

It is therefore our view, under the circumstances of this case, as outlined in our opinion, and in harmony with the conclusion reached, that the cease and desist portion of the decree should embrace nothing more than that included in Paragraph (a) of the decree as proposed by the Board. The affirmative action as proposed, should, of course, be consistent therewith. The Board may prepare and submit an enforcement decree in conformity with the views herein expressed.