# NATIONAL LABOR RELATIONS BOARD
## v. A. SARTORIUS & CO., Inc.

### No. 112.

Circuit Court of Appeals, Second Circuit.

Jan. 31, 1944.

204

Robert B. Watts, General Counsel, Howard Lichtenstein, Asst. Gen. Counsel, Joseph B. Robison, and Dominick Manoli, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

Samuel M. Birnbaum, of New York City (Samuel M. Birnbaum and Norma Rhoades, both of New York City, of counsel), for respondent.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

CHASE, Circuit Judge:

This is a petition by the National Labor Relations Board for enforcement of its cease and desist order entered against the respondent corporation pursuant to a hearing before a trial examiner upon charges brought by District 50, Local 12090, United Mine Workers of America, charging various unfair labor practices.

Respondent is engaged in the manufacture of cosmetics and accessories, and maintains its plant in the City of New York. Jurisdiction is clear and unquestioned. The hearing before the Board's trial examiner lasted nearly six weeks and the record, which is correspondingly long, contains much conflicting evidence. The trial examiner did not file an intermediate report. The Board made its findings of fact and conclusions of law, upon which it based its order now sought to be enforced, after what was unquestionably a careful review of all the evidence. From its decision only such of the facts found as appear to bear upon the issues raised on this appeal will now be noticed. Many of these findings are challenged by the respondent, but we find substantial evidence to support those which follow.

The respondent is a corporation owned and managed by Franz Neuschaefer and his wife, who is known in the factory as Helen Greene. On June 15, 1938, a union organizer began an intensive campaign of soliciting membership among respondent's employees, a number of whom joined the union and thereafter assisted in the attempt to organize the plant. On June 24, a meeting was held, at which more employees joined the union. Miss Greene heard of these activities and stated to one of the new members that the management would not tolerate the union's presence and would move the plant to Connecticut if necessary. She warned other girls employed in the factory that if they attended the meeting, which was scheduled for that evening, they would probably be discharged. In fact, her foreman did lay off all but three of the girls who joined the union that evening.

The next day Miss Greene addressed all the union workers, disparaged unions generally, interrogated individuals as to their affiliation, and made various threats designed to discourage organizational activity. All these actions were relied on as showing a violation of § 8(1) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 158(1).

Many of the girls laid off during the week of July 24 had more seniority than the ones who remained, and none of the unorganized girls were laid off at all. The respondent's foreman kept Miss Greene informed as to which were the union girls, and the discriminatory layoffs followed. Two former employees came to the factory on June 27 and requested work, but upon being told of their attitude toward the union Miss Greene said she intended to lay off all union workers until they came to their senses.

On June 27, representatives of the union submitted membership cards to the management and asked for exclusive recognition as bargaining agent for the employees.

The respondent requested a delay of eight days, pleading inexperience in such matters and other reasons; but the union declined to grant more than two days and the conference ended inconclusively. The next day the union filed charges with the Board, alleging violations of §§ 8(1) and (3) of the Act. On July 18 the union voted an immediate strike as the alternative to allowing the management's discriminatory tactics to destroy the union's hold in the shop. The strike lasted for four months.

Various efforts at settlement followed, and finally on December 23 an agreement was reached under which the union was to withdraw its charges and the respondent was to reinstate the former employees named in the union's application for reinstatement. But the respondent promptly commenced a studied program of persecution of four of the reinstated strikers, the Board found, giving them disagreeable work to do and imposing restrictive conditions and indignities upon them. This systematic course of harassment, which was in marked contrast with the considerate treatment accorded to the non-union employees, caused a number of the returned strikers to leave and induced several others not to return at all.

A number of the employees who had walked out then applied for rehiring because they stood in need of work, but they were permitted to come back only after writing letters in which they declared they had not left because of any discrimination against them. Others were closely questioned as to their union status.

One of the girls, Adeline Franco, was rehired when she stated that she was no longer a union member. She was well treated until she testified at a hearing by the Board on the union's charges of unfair labor practices. On her return to the plant she was mistreated in ways which included physical assault. After that she left.

As we have said, a great deal of the foregoing is flatly denied by the respondent, which has called to our attention a large amount of evidence tending to show that there was no discrimination at all and that whatever was done to the complaining employees was incidental to the maintenance of plant discipline. On this conflicting evidence the Board found violations of §§ 8(1), (3), and (4).

 As is not unusual in cases like this, the respondent's objection that the Board's order is not supported by substantial evidence is founded largely upon the untenable idea that we can weigh conflicting testimony. A basis for this proposition is sought to be found in the fact that the Board was required to form its conclusions from a reading of the record, since it had not the assistance of an intermediate report by the trial examiner who presided at the hearing, and from the fact that the three members of the Board disagreed upon whether and when the alleged unfair labor practices occurred. In N. L. R. B. v. Standard Oil Co., 2 Cir., 138 F.2d 885, we discussed the law limiting our power to review the findings of administrative agencies like the Labor Board. We recognized that in cases like the present one we are in as good a position as was the Board to find the facts from a reading of the record. But we pointed out that for reasons of expediency—indeed, for the reason that if the increasing mass of litigation is to be handled by the courts at all—it is necessary in certain classes of cases that fact-finding be delegated to administrative bodies, and that the statute so provides. The law having followed this plain necessity, it is for the Board alone to perform this function when the evidence is adequate, and the sole ground upon which we have power to review a finding of fact made by it is a lack of substantial evidence in the record to support that finding. If such evidence is there it is idle to argue that we can read it as well as the Board, and thus having the same opportunity for finding the facts have the same power to deal with conflicts in the evidence and to reach contrary conclusions as to its weight and the credibility of witnesses.

 This brings us back to the objection of the respondent as it is phrased in the brief, and takes our inquiry away from the wider one which appears to be lurking in the background. We are mindful of the fact that if an administrative agency ignores all the evidence given by one side in a controversy and with studied design gives credence to the testimony of the other side, the findings would be arbitrary and not in accord with the legal requirement. N. L. R. B. v. Union Pacific Stages, Inc., 9 Cir., 99 F.2d 153, 177; N. L. R. B. v. Thompson Products, Inc., 6 Cir., 97 F.2d 13, 15. But we do not think this charge can fairly be made against the Board in the present case. Its extended decision undertakes to analyze a large amount of the evidence and states the reasons which impelled it to reject

certain portions while adopting other parts. Whatever might have been our conclusions if we had been the finders of fact, we do not find the record lacking in substantial evidence to support what the Board found as herein set forth. Nor is the result changed because the members of the Board disagreed among themselves on certain of their conclusions. In so far as they did agree upon and find the facts, those facts supported as they are by the evidence are binding upon us.

What does raise an interesting point within our power of review is the respondent's contention that there was no basis for the Board's decision that § 8(5) of the Act had been violated by the refusal of the respondent to bargain collectively with the union's representatives. This contention is based not on a dispute of fact as to the actual numbers which the union represented but upon a dispute as to what part of the actual workers in the plant should be counted as employees in determining how many were needed to constitute a majority. The union had eighteen adherents only and there were thirty-six persons at work. Of these only thirty were counted as employees by the Board for the purpose of deciding, as it did, that the union represented a majority. The other six had been hired by the respondent during the strike as replacements for striking personnel. After its previous hearing in this case, on December 12, 1938, the Board certified the union as the accredited representative group, laying down what has come to be known as the "Sartorius doctrine," that in a so-called "economic strike" the employees hired by the company to replace strikers should not be considered in determining whether a union has a majority of all the employees, for the reason that if they were an employer could always defeat the strike by the simple expedient of employing enough complaisant persons to reduce the proportion of union members to less than a majority. The respondent earnestly contends that the "Sartorius doctrine" has been rejected and repudiated by the Board in its holding in Matter of Rudolph Wurlitzer Co., 32 N. L. R. B. 163, in which it did count in the strikebreakers, or replacement employees. But we think that this overlooks the fundamental factor which clearly distinguishes the two cases—the difference being that the Sartorius strike was a strike against unfair labor practices, as we shall explain, while the Wurlitzer strike was directed against the company, which had not been guilty of unlawful conduct, to compel its agreement with economic demands made by the union. The two rules are both correct and rest upon salutary principles which are not conflicting. The reason why strikebreakers should be counted in the case of an economic strike is that they have replaced those who left their employment voluntarily and terminated their status as employees unaffected by any violation of the labor laws by the employer. Where, as here, the vacancies filled were created by the unlawful coercion of the employer, the striking employees did not, by hypothesis, leave of their own accord and those who took their places as a matter of law did not displace them as employees. Thus the union had among its members eighteen of the thirty employees entitled to vote for a bargaining agent if the strike was not solely an economic one.

It was, we think, a strike directed against unfair labor practices. True, it was called partly to compel recognition of the union, but it was also a protest against the unlawful discriminatory treatment of union members. And when a strike is called for several purposes, including that of resisting unfair labor practices, it is not a purely economic strike. Republic Steel Corp. v. N. L. R. B., 3 Cir., 107 F.2d 472, 478, modified on other grounds, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6.

Though the three members of the Board disagreed among themselves as to when the violation of § 8(5) first occurred, we need not be concerned with a precise determination of this point. We are inclined to agree with the two members who felt that no violation occurred before December 12, 1938, for until the Board certified the union there existed a fair question whether it was the proper bargaining representative of the employees. As to whether the respondent's refusal to bargain was unlawful from that date until January 5, 1939, when the Board refused to set aside its certification, we express no opinion. But since the certification was in accord with the correct legal principles and there was afterward a continued refusal to bargain, it is clear that then there was a violation of § 8(5).

The respondent contends that since the union's original petition for certification in June 1938 nearly all its employees have left its plant and have been replaced

by new personnel. It says there is no reason to suppose that the company's employees as now constituted are members of the union or wish it to represent them in collective bargaining with the management. In support of its contention the respondent points to the decision in N. L. R. B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 261, 262, 59 S.Ct. 490, 83 L.Ed. 627, 123 A. L.R. 599. But the court in that case did not hold that a new election was mandatory in view of the changed conditions, and, in our opinion, that is a matter to be determined by the Board. N. L. R. B. v. P. Lorillard Co., 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380. Cf. International Ass'n of Machinists v. N. L. R. B., 311 U.S. 72, 81, 82, 61 S.Ct. 83, 85 L.Ed. 50; N. L. R. B. v. Karp Metal Products Co., Inc., 2 Cir., 134 F.2d 954. In the present case it has not seen fit to require a new election, and we cannot say its ruling was wrong. We are not unmindful of our previous decisions to the contrary, but they must yield to the later pronouncements of the Supreme Court which we have cited.

■■■■ In view of what has already been said, all the strikers were entitled to an offer of reinstatement. M. H. Ritzwoller Co. v. N. L. R. B., 7 Cir., 114 F.2d 432, 437; Black Diamond S. S. Corp. v. N. L. R. B., 2 Cir., 94 F.2d 875, 879, certiorari denied 304 U.S. 579, 58 S.Ct. 1044, 82 L. Ed. 1542. It is no answer to say that some of the girls, having been offered reinstatement and having failed to take advantage of the offer, thereby terminated their connection with the respondent company for all purposes. The record shows clearly that some of them who did return were discriminated against after resuming their work, and it is a reasonable conclusion that the spectacle of their treatment was a powerful factor deterring the others from accepting the offer to return. The offer required by the Board's order and contemplated by § 10(c) of the Act, 29 U.S.C.A. § 160(c), is one made in good faith and calculated to place the strikers on the same basis of rights and privileges with all other workers. Less than that does not amount to an offer. Eagle-Picher Mining & Smelting Co. v. N. L. R. B., 8 Cir., 119 F.2d 903, 914.

Finally it is claimed that misconduct on the part of the strikers bars them from the right to reinstatement. This contention, we think, is urged as an afterthought.

However that may be, it is not based upon facts established by any finding to which we can give effect.

Petition granted.